## J. L. ALCORN v. W. R. SADLER.

1. WATERS. *Surface water. Permanent accumulation. Rights of adjacent owners.*
   The owner may arrest or prevent the flow of surface water diffused over his land, the result of rain, snow and the like, before it gets to rest; but after it loses its casual and vagrant character on reaching a natural basin or depression, thus becoming a lake or permanent body of water, on land owned chiefly by another, he cannot drain it, to the injury of such other, in order to reclaim that part of his own land covered by the water. It matters not that the water comes from the surface of adjacent lands owned by the person seeking to reclaim.

2. INJUNCTION. *Motion to dissolve, when premature.*
   In a case of conflicting testimony, where serious questions of law and fact are at issue between the parties, and where a dissolution will practically defeat or greatly impair the relief sought, a motion to dissolve an injunction on bill, answer, and affidavits should not be sustained. The injunction should be retained till the final hearing, or at least until opportunity is had for full investigation.

FROM the chancery court of Coahoma county.

HON. W. R. TRIGG, Chancellor.

This was a bill filed by appellant, Alcorn, to enjoin the appellee, Sadler, from digging a large ditch to drain a lake or body of water situated partly on his land but mainly on the land of Alcorn. The material facts deemed necessary to be stated, in so far as they are admitted, or are established by the evidence, are these : Alcorn and Sadler are adjacent owners of large bodies of valuable land situated in Coahoma county, devoted principally to agriculture. Alcorn purchased his land about twenty-five years before the commencement of this suit, Sadler at that time being the owner of his tract. Near the centre of Alcorn's land is a natural depression, which forms the bed of a shallow lake, or, it may be termed, a cypress brake, which is in the shape of a horse shoe, about three miles long, and, on an average, about four hundred yards wide, covering an area of about five hundred and twenty acres, about four hundred and ninety acres being on Alcorn's land, and the remainder, near the northern end, being on the land of Sadler. About the centre of this brake (on Alcorn's land) is a

body of water, covering several acres, which at lowest water is from five to eight feet deep, and is devoid of timber, the body of the brake being thickly studded with cypress trees and generally covered with very shallow water. The only outlet from this brake is near the southern end, on Alcorn's land, through a small but well defined bayou, called Sheps bayou, which runs a long distance through Alcorn's land and empties into another bayou. This body of water is an accumulation of surface water which comes down from the adjacent lands, including the land of Sadler. It has never been dry, and Alcorn claims that it is a natural and well defined lake, while Sadler claims that it is only a marshy place, covered in rainy weather with surface water, most of which comes from his land. This body of water is delineated as a lake on a map of Coahoma county, made in 1872, that was introduced in evidence, but is marked "cypress," and is not expressly designated as a lake. On Hardie's official map of Mississippi, antedating the former, it also appears to be represented as a lake. Appellant, Alcorn, resided on his land and used the water in this lake or body of water, and that passing through Sheps bayou, when running, for his stock and other purposes. About 1867 or 1868 he conceived the idea of utilizing the numberless valuable cypress trees that filled the brake, and, as the water, outside of the deeper basin, was too shallow to float logs, he built a dam across Sheps bayou, near its mouth, the effect of which was to increase the depth of the water in the brake. It also increased the submerged areas, banking the water further up on the surrounding land, including that of Sadler. Appellant then erected and equipped, at considerable expense, a large milling establishment, and immediately began felling the cypress trees and floating them down to his mill to be converted into lumber, shingles, etc. Each year he confined the waters by means of his dam for a sufficient time and to a sufficient depth to enable him to float the requisite amount of timber to his mills for consumption, and then, by means of flood-gates, he would release the surplus waters through Sheps bayou. The mill was burned in 1872 or 1873, but it was immediately rebuilt and equipped without causing any material interruption of this use of the water. In this way

appellant continued to back the water up on Sadler's land each year from the time the dam was built, about the year 1867 or 1868. There is a conflict in the evidence as to the time it was completed, appellant claiming that it had been built more than twenty years before this suit was commenced, and appellee denying this.

In April, 1888, Sadler began digging a large ditch across and through his own land, for the purpose of draining all the water off the fraction owned by him, both the water that would stand there naturally, if any, and that which is caused by appellant's dam when closed.

On April 17, 1888, appellant, Alcorn, filed the bill in this case to enjoin the cutting of the ditch. In his original and amended bills he alleges the foregoing facts as to the location of the alleged lake, his erection of the dam, and his use of the water for more than twenty years. In addition to this, he alleges that, owing to the conformation of the surrounding lands, his large and valuable plantations are naturally protected from overflows of the Mississippi river, and that the proposed ditch or canal leading into a deep bayou would soon wash out and become an immense crevasse, and that the defendant would in this way not only destroy the lake and his natural water-course through Sheps bayou, but in case of overflow would let in on complainant's lands the flood waters of the Mississippi river, to his very great damage. It was further alleged that the proposed ditch would not only let off the water that was backed up on defendant's land by the dam, but would destroy the lake or body of water entirely, and thus render valueless the extensive milling establishment of complainant, besides depriving him of the use of the water for other purposes. Complainant also asserted that he had acquired an easement by an uninterrupted use of more than twenty years in backing the water up on defendant's land; and further, that defendant, after the long lapse of time, knowing of the erection of the mills and other improvements and the use of the water by complainant, was estopped to question his right so to use it.

The answer of the defendant, filed May 14, 1888, denies many of the material allegations of the bill; denies the existence of the

alleged lake, and avers that naturally it was only an accumulation of surface water that gathered there in the rainy season; explicitly denies that any such natural lake extends to the land of defendant, and says that but for the wrongful act of the complainant in erecting the dam across the natural outlet, defendant's land would be free from water the greater portion of the year; denies that the cutting of the ditch would interfere with the water as it would exist but for the dam, and avers that even with the dam the whole of defendant's land is often entirely free from water; denies that the dam had been built more than twenty years, and asserts that defendant never had any knowledge that complainant claimed any easement or right to back the water up on his (defendant's) land; avers that he did not know until 1871 that any part of his land was being flooded, and that he then informed complainant that he intended to drain his land for pasturage, and that Alcorn did not object and did not claim any easement. The answer also denies that Coahoma county is subject to overflow by the Mississippi river, and says that it is protected by levees; denies that complainant's land is protected by a natural ridge or elevation, and denies that the opening of the ditch would cause a crevasse, or that any of the complainant's rights would be affected thereby.

On filing his answer, the defendant made a motion to dissolve the injunction on bill, answer and affidavits, and the affidavits of a number of witnesses were read on behalf of each party on the hearing of the motion. The motion was sustained and the injunction was dissolved in advance of a hearing, and before the expiration of the time allowed for taking testimony. From the decree dissolving the injunction, the complainant appeals.

The testimony was conflicting as to many of the controverted questions above stated. As this court only passes upon one question of fact, and that only to the extent of declaring that the evidence tends to establish the proposition stated in the opinion, without adjudicating anything, except that the injunction should have been retained until further investigation, it is not deemed necessary to set out the evidence, or to make any further statement of the facts.

*Cutrer & Cutrer,* for appellant.

1. The water on appellant's land has formed a well marked basin, and has become permanently settled. The bed of the lake has always been covered with water, as far as the memory of the oldest witnesses extends. There is a vast difference between the right the owner has to direct the flow of mere surface water squandering over the face of the earth, and in water after it has lost its casual character and assumed definite, regular and permanent form. The water rights of appellant in this case are not based upon the recent creations of new-born rivulets, "a mere child of the passing storm and destined to vanish in the night." They are of definite form and stable character. Such a body of water is recognized by the law and protected by it. Goddard on Easements, pages 70, 240, 241; Gould on Waters, §§ 79, 83; *Mohr* v. *Gault,* 10 Wis. 513; *Bucklen* v. *Truell,* 54 N. H. 122; *Schaefer* v. *Marthaler,* 34 Minn. 487. In the line of these authorities is *Boyd* v. *Conklin,* 54 Mich. 590.

2. Sheps bayou, the natural outlet of this body of water, is a stream or water-course, which cannot be interrupted or diverted. *Earle* v. *DeHart,* 12 N. J. Eq. 280; Wasburn on Easements, pages 308–314; Gould on Waters, § 41; *Ferris* v. *Wellbourn,* 64 Miss. 29; Angell on Water-Courses, § 108; Goddard on Easements, p. 241.

If the natural outlet be obstructed, the right of appellee, if he has any still remaining, must be directed, if at all, to the removal of the obstruction. *Mohr* v. *Gault,* 10 Wis. 513; *Bennett* v. *Murtough,* 20 Minn. 151; *Railway Co.* v. *Dyche,* 31 Kans. 120.

3. The appellee, in the motion to dissolve, bears the burden, and must prove to the satisfaction of the court the *lack of all equity* in complainant's bill. High on Inj., §§ 1467, 1470. So far from this, the evidence is conflicting, and the most that can be said is that the questions are in *doubt.* For this reason alone, the injunction should have been retained. Ib., § 1510.

The injunction should be continued until a full hearing on the merits. If complainant is right, the dissolution will cause irreparable injury to him; whereas, if the statements of appellee are

66 Miss.—15

true throughout, he will not be prejudiced by a continuance of the injunction to the hearing, as his damages will be a mere moneyed demand protected by the injunction bond. High on Inj., §§ 1491, 1509, 1512, 1524.

4. In any view of the case, appellant is entitled to a modification of the decree of dissolution, to the extent of requiring that the appellee in digging the ditch shall preserve, without diminution, the water in the lake at its normal height when not confined by appellant's dam, and so as not to interfere with the natural flow of the water through Sheps bayou.

So far as mere surface water, outside of and distinct from the lake, is concerned, there is no controversy. Appellant does not complain that the digging of the ditch by appellee will cause the *loss of surface water* that otherwise would flow into the reservoir, but that its certain effect will be to *destroy the lake itself.* Bearing this distinction in mind, we deem it unnecessary to consider the authorities cited by opposing counsel, which discuss the subject of surface water.

(Counsel also made an elaborate argument and cited numerous authorities in the effort to show that appellant had acquired an easement in the land of appellee by the use of the water, and that the appellee, after remaining silent so long, is estopped to interfere with such use, or to do anything to the prejudice of appellant's rights in the premises ; but, inasmuch as the court does not expressly pass upon these questions, this portion of the brief is omitted by the reporter.)

*D. A. Scott* and *Calhoon & Green,* for appellee.

It is plain from the record in this case :

1. That Sadler's land is higher than Alcorn's.

2. That the water in Alcorn's cypress brake or swamp, when there at all, is but an accumulation of surface water, descending from the higher adjacent lands. In fact, it is but a *marsh.*

3. That Alcorn, about twenty years ago, constructed a dam on his own land, so as to prevent the natural outflow of this water over his land, thus backing it up in his brake and on Sadler's higher land and the higher land of one Bridges.

4. Bridges objected, and this compelled Alcorn to buy his land, *less than twenty years ago.* But the water was still backed up on Sadler's land, he being then, and for several years afterward, absent and not cognizant of the dam.

5. Alcorn is in the habit of opening this dam and letting off the water in summer, and closing it again at his pleasure.

6. The object of constructing this dam was to bank up surface water for his private benefit, and it was to the damage of all other landowners upon whose land the water was so backed.

7. Alcorn asked nobody's consent to do this, and he acknowledges in his bill *in equity* that it was, as to the others, a merely lawless trespass which, in a court of conscience, he claims to have become a right by prescription within the memory of man. He wants equity to sanctify his own wrong, and to prevent others from putting their land in condition for proper tilth.

8. Sadler, not understanding that such claim would be made, or indisposed to acquiesce in it when made, was cutting a ditch to redeem some of his own land from the overflow resultant from Alcorn's wrongful act, when he was enjoined at Alcorn's suit.

9. Alcorn, once each year since he built his dam, has been opening it to let off the water, and closing it again at pleasure, thus committing a fresh trespass every time he closes it.

There is a broad distinction between the right to the use of waters of a stream which has a definite channel and banks, and any right to surface water. In the former case the proprietor above cannot unreasonably interfere with the fall, but with his surface water, that which falls generally on his lands from rains and snows, he may do as he pleases for the better tilth of his own land, and no lapse of time gives the lower proprietor any right to an easement or property in such water. To hold otherwise would be to give the owner of the reservoir proprietorship, in time, of the entire water-shed which feeds it. Gould on Waters, §§ 263, 298 ; Angell on Water-Courses, § 108 *et seq. ; Wheatley* v. *Baugh,* 25 Pa. St. 531, a very important case, where the court, among other things, says : " To entitle a stream to the consideration of the law, it is certainly necessary that it be a water-course. Small as it may

be, if it have a clear and well-defined channel, it cannot be diverted to the injury of the proprietor below, whether above ground or subterranean; neither can the proprietor below so obstruct such as to throw the *water back on his neighbor above.* But percolations spread in every direction, and it is impossible to avoid obstructing them without relinquishing the necessary enjoyment of the land." * * * " Silence or acquiescence, where one is not being in-jured, can never deprive him of his rights on the ground of pre-sumption of grant." To the same effect are the following cases: *Woodbent* v. *Ramsbotham,* 11 Exch. 602 ; *Ramstron* v. *Taylor,* Ib. 380 ; *Walcott* v. *Cushing,* 11 Cush. 195 ; *Luther* v. *Winnisiment,* Ib. 171 ; *Parks* v. *Newberryport,* 10 Gray 28 ; *Godale* v. *Tuttle,* 29 N. Y. 459 ; *Buffone* v. *Harris,* 5 R. I. 243 ; *Roath* v. *Driscoll,* 20 Conn. 533, which is exactly in point, and where the court says that no advantage can result in such case from long use, as " each owner has an equal and complete right to the use of his land and to the water which is in it."

In *Bawlsley* v. *Speer,* 31 N. J. Law 352, the court says : " It is not one of the legal rights appertaining to land that the water falling upon it from the clouds shall be discharged over lands con-tiguous to it. There is no such thing known to the law as the right to any particular flow of surface water."

The only case we find squinting at any right in appellant is *Schaefer* v. *Marthaler,* 34 Minn. 487, and in that case there was a dissenting judge, and the case has reference to a *lake* (not a mere marsh or swamp) partly on the land of both parties to the suit, mutually enjoyed for thirty years, and the case acknowledges there is no authority to sustain it.

The general proposition is that the lower lands are necessarily subservient to the higher lands in receiving the surface water flow-ing down upon them. The lower proprietor may avoid this by all proper means, but he may not bank the water up on the higher lands.

The bill does not allege the existence of a water-course, but it, and all the testimony, show that the land was flooded by surface water strictly. Washburn on Easements 279, 280, 465 *et seq.*;

Angell on Water-Courses, §§ 108, 379 ; Goddard on Easements 134 ; Gould on Waters 263 ; 9 Am. R. 284 ; 13 Ib. 213 ; 52 Ib. 831 ; 56 Ib. 80 ; 58 Ib. 220 ; 59 Ib. 242.

Consider the condition of our swamp country. If the court shall announce a rule that the owner of the higher lands—all being swamp—cannot ditch so as to put them in condition for tilth, one man, by a dam, may render worthless many thousands of acres of valuable soil. He may acquire rights by prescription as against men having outlying wild lands, with no knowledge of the dam, who would thereby be prevented from ever putting their lands in cultivation, and without which cultivation their lands might not be worth a dam.

It seems all right to appellant to erect a dam and flood his neighbors. By putting it down he can avoid all trouble from the Mississippi river waters. But his patriotism is actively excited as soon as his neighbor tries to avoid the waters he has unjustly backed up on him.

In this case there is no lake, but only a marsh, and it is questionable if our ditch harms any one. The testimony as to all the material facts is conflicting, and as the chancellor decided for us, we claim all the presumptions arising from his decision.

CAMPBELL, J., delivered the opinion of the court.

The injunction should not have been dissolved. The evidence tends strongly to show that there is a body of water covering five or six hundred acres of land owned for the most part by Alcorn, and that a small part of it is owned by Sadler ; that this existed naturally because of the conformation of the earth in that region, and that the excavation proposed and about to be made by Sadler would drain this water and destroy the collection. It matters not that the water comes from the surface of adjacent lands owned by Sadler. He may arrest its flow over his land and divert it before it gets to rest in the reservoir or lake or whatever the body of water may be called, but after it loses its casual and vagrant character as surface water diffused over his land, and reaches the place of rest and becomes a body or collection of water,

owned chiefly by another, he cannot lawfully drain it and destroy what belongs to that other in order to clear of water that part of his own land covered by it.

We approve the decision of *Schaefer* v. *Marthaler,* 34 Minnesota 487, and in the absence of such precedent would not hesitate to announce a rule so obviously just and harmonious with the rules of law applicable to water.

There are other questions in this case, but we decline to decide them at this stage of the controversy since the above disposes of this appeal.

*Reversed and remanded.*

Afterward *D. A. Scott* and *Calhoon & Green,* on behalf of appellee, filed a suggestion of error, in which the testimony was reviewed at length, and it was contended that the court had erred in the application of the principles of law to the facts. It was also urged that the court in ruling on the question as to the dissolution of the injunction seemed to have disposed of the main question of fact in the case against the appellee, before formal proof taken, and to the prejudice of appellee at the final hearing on the merits. Under the authorities previously cited, and in accordance with the decision in *Schaefer* v. *Marthaler,* 34 Minn. 487, approved by the court, it was strenuously insisted that Sadler had the right, at least, to drain his land, if he did not thereby drain Alcorn's, and put it as it would be without the dam erected by Alcorn across the natural outlet.

To the suggestion of error, the following response was made :

*Per Curiam.*—We have adjudicated nothing in this case, except that the injunction should be retained until further investigation is had, or at least opportunity for it is given. We are satisfied with the legal principle announced in the opinion and adhere to it, but further than this have not intimated the view that should be taken of the case on a future hearing.

*Denied.*