CASE, Appellant, vs. HOFFMAN and others, Respondents.

*March 1 — March 21, 1893.*

*Watercourses: Pleading: Joinder of causes of action: Equity.*

1. A complaint alleged that northwest of plaintiff's land there were living springs which continuously flowed and discharged their waters by a well defined stream into a natural lake of about sixty acres in extent; that from said lake the waters so gathered flowed, under natural conditions, upon the surface and beneath the surface of the lands lying to the southeast of said lake to and across the lands of the plaintiff, and thence easterly until they discharged themselves and were again collected in a stream known as Beaver Creek, two miles or more from plaintiff's land; that the said natural flow or stream of water from said lake was well defined and established, and in

places, one of which was upon plaintiff's land, had made for itself a distinct and plainly marked channel, showing the natural flow of the water; and that said stream was known by the name of the West-Branch of Beaver Creek. *Held*, on demurrer, that the complaint described a watercourse over plaintiff's land, although it further showed that the stream spread over wide reaches of marsh and swamp lands, and percolated the soil in many and most places between the said lake and Beaver Creek.

2. Besides asserting plaintiff's right to have the water flow through his land, based on the existence of a watercourse, the complaint alleged a right to such flow under a contract with defendants' grantors, and also a right thereto even if the waters did not technically constitute a watercourse. *Held*, that these were not several or inconsistent causes of action.

3. An action to have plaintiff's rights to said water established and the said contract specifically performed, and to restrain the diversion of the waters from his land, is one of equitable cognizance.

APPEAL from the Circuit Court for *Jackson* County. The facts are stated in the opinion.

For the appellant there was a brief by *La Follette, Harper, Roe & Zimmerman*, attorneys, and *H. W. Chynoweth*, of counsel, and oral argument by *R. M. La Follette* and *Mr. Chynoweth.* To the point that the complaint describes a natural watercourse, they cited, besides cases cited in the opinion, *West v. Taylor*, 16 Oreg. 165; *Montgomery v. Locke*, 72 Cal. 75; *Potter v. Howe*, 141 Mass. 357; *Palmer v. Waddell*, 22 Kan. 352; *Crawford v. Rambo*, 44 Ohio St. 279; *Byrne v. M. & St. L. R. Co.* 38 Minn. 212; Gould, Waters, sec. 263; Washburn, Easem. (4th ed.), 363; *Luther v. Winnisimmet Co.* 9 Cush. 171; *Ashley v. Wolcott*, 11 id. 192. To establish a natural watercourse, it is enough to show (1) that the water has a living source and is something more than that which comes from rain or melting snow; (2) that there is a stream usually flowing in a particular direction; (3) that it flows in a defined channel having a bed, sides, or banks, and usually discharges itself into some other body of water. But it need not flow in a defined

channel continuously, and its waters may in places spread out over the surface of the ground and flow without any fixed channel from time to time, if it thereafter gathers within banks and flows in a definite channel.

For the respondents there was a brief by *Bushnell, Rogers & Hall,* attorneys, and *Gardner & Gaynor,* of counsel, and oral argument by *F. W. Hall* and *Geo. R. Gardner.* They contended, *inter alia,* that the court has no jurisdiction of the subject of the action. The plaintiff must establish his rights in an action at law before a court of equity will enforce them. *Sheboygan v. S. & F. R. Co.* 21 Wis. 667; *Remington v. Foster,* 42 id. 608; *Pennoyer v. Allen,* 51 id. 360. The complaint does not describe a natural watercourse. It does not state that there is a stream usually flowing in the channel. Banks and bed are not claimed for it, and there is nothing in the language of the complaint to justify the statement of a constant flow in a strong current. Gould, Waters, secs. 41, 264; *Lessard v. Stram,* 62 Wis. 112; Wood, Nuisance, 10; Angell, Watercourses, sec. 108; 30 Am. Law Reg. 237; *Barkley v. Wilcox,* 86 N. Y. 140; *Bloodgood v. Ayers,* 108 id. 400; *Pettigrew v. Evansville,* 25 Wis. 223; *Hoyt v. Hudson,* 27 id. 658; *Gibbs v. Williams,* 25 Kan. 214.

ORTON, J. This is an appeal from the order of the circuit court sustaining a demurrer to the complaint on the ground that it did not state a cause of action. The facts stated in the complaint are substantially as follows:

The plaintiff is the owner of 440 acres of land in sections 21 and 22, town 20, range 1 E., purchased and suitable for the cultivation of cranberries. "There is a natural stream of water known as 'Beaver Creek,' with clearly-defined banks and a fixed channel, varying in depth, but always with a steady flow of the waters in an easterly direction, bearing south, through the northern portion of

said town 20, at a distance of about two miles from the plaintiff's said lands, and, after passing the eastern line of the town, bends its course so as to flow in a southerly and southwesterly direction for a considerable distance below the south line of said town. There were always and still are in the northwestern portion of said town living springs, which continuously flow and discharge their waters by a well-defined stream into a natural lake of about sixty acres in extent, situated in section 8 of said town, known as 'Big Lake.' From said lake the waters so gathered flowed, under natural conditions, upon the surface and beneath the surface of the lands lying to the southeast of said lake to and across the said lands of the plaintiff, and thence easterly, until they discharged themselves and were again collected in said Beaver Creek. The said natural flow or stream of water from said lake in section 8 was well defined and established, and in places, one of which was upon the land of the plaintiff, had made for itself a distinct and plainly marked channel, pointing and showing the natural flow of the water; and said stream was known and called by the name of the 'West Branch' of Beaver Creek. At the time of the purchase by the plaintiff of his said lands in section 22, the actual flow and source of the water above described from said Big Lake still continued as in a state of nature across the lands of the plaintiff as aforesaid, discharging to and upon the lands lying to the east of the plaintiff, and to some extent to the south of the lands of the plaintiff, and were to a considerable extent dispersed over a large area of land drained by Beaver creek. The plaintiff's lands were also supplied with water from surface springs, northward therefrom, in large numbers, constant in their supply, furnishing a large quantity of living water, moving in a southeasterly direction through and across the lands lying between said springs and plaintiff's land, and over, through, and across said lands, though not usually in

perfectly defined channels. At the time of the purchase of said lands in section 22 by the plaintiff as aforesaid, immemorially theretofore, and thereafter continuously until about the year 1883, the waters of said West Branch, together with the other waters last aforesaid, were sufficient in volume adequately to irrigate and supply waters sufficient to moisten said lands and make them suitable to the cultivation of cranberries." Immediately after the purchase of the lands in section 22, the plaintiff began the cultivation of cranberries on said land, and cut ditches across the same to make available the natural flow of said waters, and has continued to improve said lands for such purpose by an expenditure of a large sum of money; and the improvements so made are of the value of $12,000, and the lands, with said improvements, are now of the value of $20,000.

The complaint then states, in substance, as follows: About 1883, D. A. and C. A. Goodyear built a sawmill about a mile south of plaintiff's land, and for the purpose of getting logs from near said Big Lake to their mill, they obtained an act of the legislature (ch. 271, Laws of 1883), and claimed to act in accordance with the same, and made a ditch or canal from six to twelve feet wide, and four feet deep, from Big Lake along the general course of the West Branch aforesaid, down through a portion of the plaintiff's lands, and to said sawmill, and floated logs to said mill; but they so conducted their business and managed their ditch as to greatly injure the lands of the plaintiff and others. They then entered into a contract with the plaintiff to make such ditches on his land with supply gates, so that he could make the same use of the waters of said West Branch as before said large ditch was made. The cutting of this ditch not only used all the waters of said West Branch along their natural channel and bed, but diverted the same as it left the plaintiff's land into another direction

to said mill, and southeastwardly to a stream called "Silver Creek," a long distance from Beaver Creek, into which it formerly ran and was a tributary thereof. A branch ditch was also cut into Beaver Creek northwardly, which diverted a portion of its waters also to the said mill and into Silver Creek. The plaintiff continued to enjoy the advantages of said contract until the said mill and the floating of logs to it through said big ditch were abandoned, and the Goodyears sold out all their interest in the same to the defendants in 1889. The defendants then closed up the plaintiff's gates by which he was wont to obtain sufficient water for his cranberry culture, and cut ditches from the main ditch outside of plaintiff's lands and around the same, and diverted all the water of said West Branch and of said main ditch around and away from the same to said mill and Silver Creek, and thereby nearly destroyed the use of the lands and improvements of the plaintiff. But some water escaped through the east banks out of repair and beneath the broken gates, which he used to irrigate his lands to a limited extent. The defendants then constructed ditches, dams, and embankments, solely for the purpose of removing and diverting said watercourse wholly from and off the plaintiff's lands, intending thereby to deprive the plaintiff from receiving a supply of living water from any source whatever for his lands. The plaintiff's cranberry crop is now liable to destruction from the want of water.

The plaintiff prays that his rights may be established to said water; that the Goodyear contract be specifically performed; that the defendants be enjoined from diverting said waters, and be required to remove said obstructions to the natural flow thereof; and that the plaintiff be permitted by the order of the court to cut through said dam and allow the waters to pass through the plaintiff's land; and, finally, for damages of $3,500, and for other relief.

The principal contention of the learned counsel of the

respondents in support of the demurrer is that the waters coming to the plaintiff's lands, and for the diversion of which the plaintiff complains, are mere *surface waters*, which the defendants had their right to deal with on their own land and for their own benefit as they saw fit, and that their alleged diversion thereof from the plaintiff's lands does not give him any right of action therefor. The learned counsel of the appellant contend that such waters are of a *natural watercourse* and living stream, in which he has the rights of a riparian proprietor, and that therefore he has in this action the right to recover for the diversion thereof by the defendants.

The distinction between mere surface waters and a natural watercourse is wide enough to be readily discerned, and to determine which the complaint describes is not difficult. We will first briefly examine the law and the authorities as to the peculiar and indispensable elements and characteristics of each, and then make application of them to the complaint.

First. Surface water is such as its name indicates. It spreads over the *surface* of the ground. It has its origin most commonly in rains and melted snow. It may stand in swamps, or it may percolate through or under the soil. It is as well defined, and the law applicable to it stated as well, in *Hoyt v. Hudson*, 27 Wis. 656, as in any case in the books. "The doctrine of the common law," says Chief Justice Dixon, "is that there exists no such natural easement or servitude in favor of the owner of the superior or higher ground or fields as to mere surface water, or such as falls or accumulates by rain or the melting of snow; and that the proprietor of the inferior or lower tenement or estate, may, if he choose, lawfully obstruct or hinder the natural flow of such water thereon, and in so doing may turn the same back upon or off onto or over the lands of other proprietors, without liability for injuries ensuing from such

obstruction or diversion." Nearly the same language is used by the same learned chief justice in *Pettigrew v. Evansville*, 25 Wis. 223. It is further described as " waters flowing in hollows or ravines, from rain or melting snow; " or, " drainage over the land occasioned by unusual freshets or other extraordinary causes," and are not permanent, but soon pass off or dry up when the cause ceases. *Fryer v. Warne*, 29 Wis. 511; *Eulrich v. Richter*, 37 Wis. 226; *Allen v. Chippewa Falls*, 52 Wis. 434; *O'Connor v. F. du L., A. & P. R. Co.* 52 Wis. 530; *Hanlin v. C. & N. W. R. Co.* 61 Wis. 515; *Lessard v. Stram*, 62 Wis. 112. " Surface water lies upon or spreads over the surface, or percolates the soil, as in swamps, and does not flow in a particular channel." " The owner may expel surface water from his own land to that of another without wrong." Gould, Waters, § 263. " But one may do so only to protect himself, or to benefit his own land, but no further." " But even surface water becomes a natural watercourse at the point where it begins to form a reasonably well-defined channel, with bed and banks or sides, and current with nearly constant flow." Id.

Second. A natural watercourse is also as well defined and the law that governs it stated in our own cases as anywhere. Says Chief Justice DIXON, in *Hoyt v. Hudson, supra:* " The term ' watercourse ' is well defined. There must be a stream usually flowing in a particular direction, though it need not flow continually. It may sometimes be dry. It must flow in a definite channel, having a bed, sides, or banks, and usually discharge itself into some other stream or body of water." The following streams are held to come within this definition. In *Spelman v. Portage*, 41 Wis. 144, the streams held to be watercourses were across the low grounds of considerable extent between said rivers, which had their origin in the overflow of the Wisconsin river to the Baraboo river, caused by unusual freshets.

They had no well-defined channels or banks, but spread widely over the intervening ground. They came from one unquestionable watercourse, and passed into another one, and did not lose their character as watercourses by passing and spreading over the intervening low ground. In *Gillett v. Johnson*, 30 Conn. 392, there was a living spring about sixteen rods from the dividing line on the land of the defendant. It ran off in a stream that would fill a half-inch pipe. The supply was constant, except in a very dry time. For six or eight rods it ran rapidly between abrupt banks and in a well-defined channel. It then came to marshy ground, where it spread out, so that its flow was slight, in a sluggish current, but in a natural bed or depression to a watering place on the plaintiff's land. The defendant diverted the stream on his own land from the watering place of the plaintiff. It was held to be a watercourse, and the defendant liable. In *Macomber v. Godfrey*, 108 Mass. 219, the stream came across a road onto the defendant's land, in a well-defined channel, but when within five rods of the plaintiff's land, below it, spread out several rods in width, and so it ran upon the plaintiff's land, which was a flat and level meadow, where it irrigated it in a valuable manner, and there was no defined channel on the plaintiff's land; but a short distance below his land it again formed into a brook, with a channel and current, and so ran on and emptied into a river. Held to be a watercourse, which the defendant could not divert from the plaintiff's land. In *Miller v. Laubach*, 47 Pa. St. 154, the waters came from winter springs on defendant's land, and soon spread out and made his land wet and boggy, and they were wont to pass onto the plaintiff's land, and there soon dry up by evaporation. The defendant cut a ditch on his own land, which gathered the waters together and discharged them on the plaintiff's land in such a manner as to cause him great injury, by making his land wet and useless. The de-

fendant was held liable. In *Kauffman v. Griesemer*, 26
Pa. St. 407, the stream came from springs on the plaintiff's
land, which, increased by rains and snow, ran down on and
through the defendant's land and emptied into a creek.
They ran in a general channel, but their flow was not con-
tinuous. The defendant made a sod dam at his line, and
thereby turned the waters back onto the plaintiff's land,
to his injury. It was held that this stream was a water-
course, and governed by the maxim of the common law,
" *aqua currit et debet currere*," and the plaintiff recovered.
In *Rhoads v. Davidheiser*, 133 Pa. St. 226, it is held that
even surface water, if it run in a channel with banks and
current and in a certain direction when there is water,
although not continuously, is a watercourse and governed
by the same law. In *Earl v. De Hart*, 12 N. J. Eq. 280, it
is held that when the country is such that the water from
rains and melting snow is necessarily collected into one
body, so large as to require an outlet, and is discharged
through it in a well-defined channel, where it is accustomed
to flow and has flowed from time immemorial, such chan-
nel is an ancient natural watercourse. The common-law
doctrine prevails in New Jersey. A spring without an
outlet or inlet is not a watercourse, but if it have an out-
let through a well-defined channel it is a watercourse.
*Delhi v. Youmans*, 50 Barb. 316. Where a spring rises on
one man's land, and from it a stream runs with a current
and in a well-defined channel onto the land of another
below, although it furnished no more water than the supe-
rior proprietor could use for domestic purposes and to
water his land, he cannot divert or wholly consume it to
the detriment of the inferior owner. *Arnold v. Foot*,
12 Wend. 330. *Smith v. Adams*, 6 Paige, 435, is to the
same effect. "A spring, to be protected by the law, must
be one which issues out of the earth by natural forces."
Gould, Waters, § 286. A spring becomes a watercourse at

the point where the water comes to the surface and flows off in a defined channel or bed, with banks or shores which confine the water and cause it to run in a certain direction. Id. § 41. It must have a current, or it cannot be obstructed or diverted to any one's injury. If a watercourse is lost in a swamp or lake, it is still a watercourse if it emerges therefrom in a well-defined channel; or if it spreads over a meadow, and it can be identified or traced as the same stream, it is still a watercourse. Id. § 264; *Briscoe v. Drought*, 11 Ir. C. L. 250; *Munkres v. K. C., St. J. & C. B. R. Co.* 72 Mo. 514; *Hebron G. R. Co. v. Harvey*, 90 Ind. 192; *Robinson v. Shanks*, 118 Ind. 125. "If the channel and banks formed by running water present to the eye at a casual glance the unmistakable evidence of the frequent action of running water, then it is a natural watercourse." Gould, Waters, § 264.

I will close these citations by a very strong case in favor of the plaintiff's right, in this court. The plaintiffs owned a mill at Cross Plains, on Black Earth Creek. The creek had its rise in Mud Lake in another town, which lake was partially fed by springs but mainly by rains and surface waters, and out of it the waters flowed through an outlet into Black Earth Creek; but the outlet had been considerably filled up. The defendant sought to excavate an outlet on the opposite side of said lake, and draw off the water into a big marsh, and so eastwardly by Pheasant Branch into Lake Mendota, and wholly divert them from Black Earth Creek, to the injury of the plaintiffs' mill power. In *Mohr v. Gault*, 10 Wis. 513, Chief Justice Dixon said, in passing upon the above facts: "The owners along the creek have a legal right to the natural and usual flow of the waters of the lake through it." It is said also in the opinion, as it was also found by the trial court, "that there was no perceptible fall or difference in the height of the surface of the lake from one end to the other." "The

depth of this lake was from two to seven feet, and the main body was covered by vegetation." " The waters had been raised one and a half feet by the filling up of this outlet, and more than that by *surface waters* running into it from the adjacent country." The defendant sought to divert the waters of the lake in the proposed direction, in order to drain his own land covered by its waters to the depth of from a few inches to three feet. From this it appears that this lake is protected as a natural watercourse.

Application may now readily be made of these principles and authorities to the waters described in the complaint.

1. North of the plaintiff's land " there were *always,* and are yet, *living* springs, which continuously flow and discharge their waters by a well-defined stream into a natural lake of about sixty acres in extent, known as ' Big Lake.'" This being the source of the waters, it is material to inquire whether, so far as described, they constitute a natural watercourse. " A well-defined stream," that has flowed continuously forever from everlasting springs, and made a lake of such extent, must have had a well-defined " channel," strong " current," and " bed and banks,"— all the characteristics of a watercourse. From the words of description used, common reason supplies every element of such a natural stream as to make it a watercourse in law and fact. The springs had been gathered into one stream, which made a watercourse to all intents and purposes; and " Big Lake " was certainly a watercourse, according to the above decision. What becomes of it afterwards?

2. From the lake the waters so gathered flowed, under natural conditions, upon and beneath the surface of the lands lying to the southeast of said lake, *to and across* the land of the plaintiff, and thence easterly, until they *discharged* themselves and were again *collected* in the " Beaver Creek." This distance is but a few miles. Did this natural watercourse lose its essential character by its course

from Big Lake to Beaver Creek? Did it become mere surface waters? There is not one word descriptive of "surface waters" in the complaint. The waters all go in the same direction, and are tributary to Beaver Creek.

3. "The said natural flow or stream of water from the lake was *well defined* and *established*, and in places, one of which was upon the land of this plaintiff, had made for itself a *distinct* and *plainly marked channel*, pointing and showing the *natural flow* of the water; and said stream was known and commonly called by the name of the 'West Branch' of Beaver Creek." Would it not be idle and hypercritical to say: "But this description does not use the words 'bed and banks' and 'current,'— the language of the books in describing a watercourse"? These waters in such volume could not flow continuously, *always in a distinct and plainly marked channel, well defined and established*, without making for themselves a bed and banks or sides to the stream in the places mentioned, one of which is on the land of the plaintiff. It is a most reasonable, necessary, and inevitable consequence by the laws of nature. Such a body of water, gathered into a stream and flowing in one channel continuously, could not help from cutting for itself in suitable soil or high ground a watercourse, with banks, bed, and current, any more than it could help from running down an inclined plane. Admit that the complaint shows that this stream spreads over wide reaches of marsh and swamp lands, and percolates the soil in many and most places between Big Lake and Beaver Creek, or in all places except those mentioned, where the ground was suitable for cutting a well-defined channel, as above described; according to the above authorities, such spreading of a stream through marshes and swamps, on or below the surface, does not militate against its being a watercourse in every essential particular, if it can be traced or identified as the same stream; and its identity is alleged in

the complaint in this case, and it is a fact to be proved and
established on the trial.   A stream that can be utilized by·
confining its waters in a ditch or canal, wide and deep
enough for floating logs down from Big Lake past the
plaintiff's land, is not small or inconsiderable.  Even where·
it widely spreads over or under intervening marshes, it
must have considerable current and a constant flow to-
wards Beaver Creek, across the lands of the plaintiff.

In view of the above authorities, and on well-established
principles, there would seem to be no question but that
these waters constitute a watercourse over the lands of the
plaintiff, and that he has an " equal right, inseparably an-
nexed to the soil, to their use for every useful purpose to
which they can be applied as they are wont to run, without
diversion, alteration, or diminution."   *Wadsworth v. Til-
lotson,* 15 Conn. 366; *Perkins v. Dow,* 1 Root (Conn.), 535.

This stream being so clearly and unquestionably a water-
course in which the plaintiff's rights are protected by the
law, and this being the main and material ground of the
plaintiff's complaint and cause of action, and sufficient to
sustain the complaint as against the demurrer, other mat-
ters alleged therein as grounds of the action, such as the
plaintiff's rights under the Goodyear contract, and his
rights in these waters upon his land even if they do not
technically constitute a watercourse, will not be considered
any further than to say that they do not constitute several
and inconsistent causes of action, but are different grounds
of the same action.

The jurisdiction of a court of equity to take cognizance
of the matters of the complaint, and to grant the relief de-
manded, has been sustained by this court in many cases.
*Sheldon v. Rockwell,* 9 Wis. 166; *Patten v. Marden,* 14 Wis.
473; *Pioneer W. P. Co. v. Bensley,* 70 Wis. 477; *Patten
Paper Co. v. Kaukauna W. P. Co.* 70 Wis. 659; *Cedar Lake*

*Hotel Co. v. Cedar Creek Hydraulic Co.* 79 Wis. 302; *Kimberly & Clark Co. v. Hewitt*, 75 Wis. 371.

*By the Court.*—The order of the circuit court is reversed, and the cause remanded for further proceedings according to law.

WINSLOW, J., and PINNEY, J., dissent.

See note to this case in 20 L. R. A. 40.— REP.