Rait v. Furrow.

---

## A. C. RAIT v. J. G. FURROW.

No. 14,626.   (85 Pac. 934.)

SYLLABUS BY THE COURT.

1. WATERCOURSES—*Definition of a Natural Watercourse.* Where water runs in a well-defined channel, with bed and banks made by the force of the water, and has a permanent source of supply, it is to be regarded as a natural watercourse, although the stream may be small, its course short, and it may have existed for only a short time.

2. —— *Source of Supply.* The source of supply may be springs, surface-water, or a pond formed by surface-water;

but, whatever the source, if it has the element of permanence it becomes a natural watercourse where the water comes to, or collects on, the surface and flows in a well-defined channel and bed, with such banks as will ordinarily confine the water and cause it to run in a definite direction.

3. ———— *Permanence—Age.* While the element of permanence is necessary, great age is not an essential attribute of a watercourse.

4. ———— *Character of Outlet Immaterial.* A stream may be a natural watercourse although its outlet be over the unchanneled surface of lowland, and not into another watercourse.

Error from Geary district court; OSCAR L. MOORE, judge. Opinion filed June 9, 1906. Affirmed.

### STATEMENT.

THIS was a suit by J. G. Furrow to enjoin A. C. Rait from maintaining an embankment and thereby obstructing what is called a natural watercourse flowing through his land and upon that of Rait. The trial court made findings of fact from which it appears that Furrow owns a farm in Geary county, and adjoining it on the east is a farm owned by Rait. The south part of the two farms is hilly land, and the remainder is bottom-land which is nearly level. Two ravines, beginning in the hills, come down on Furrow's land and are designated "West creek" and "East creek." West creek is conceded to be a watercourse. East creek drains about 800 acres of land in the hills, and has a well-defined course, with banks from one to three feet deep, until it reaches the level land.

In an early period, when there were heavy rains, the water ran down East creek to Furrow's land, and from there followed a depression until it reached and spread out over Rait's land. There was then no well-defined channel over the bottom-land and along the course which the water ran, but it passed over a depression in Furrow's land for about 1300 feet before it reached Rait's land. Along this depression there were numerous erratic, wet-weather springs, which appeared and

disappeared from time to time; but, except during wet weather, these springs did not furnish sufficient water to make a current or channel extending to and upon defendant's land. The water which came down this depression spread out over the depression on. Rait's land, and, without forming a definite channel or taking a common course, worked a distance of 200 or 300 yards to the southeast, where it usually formed a pond of water in a deeper depression on Rait's land, and from this point worked its way eastward and northeastward toward the river, without forming any definite or visible course until it left defendant's land.

About twenty-three years ago the parties cut an artificial ditch from East creek, at the foot of the hills, over to. West creek, in an effort to convey the water from the former over to the channel of the latter. This was sufficient for that purpose, except during heavy rains, until the floods of 1903. Prior to that year, and during the heavy rains, the water would overflow the banks of this ditch and run down over the depression on Furrow's land and onto that of Rait. It did not, however, break through the turf or make a definite channel. There were some holes and irregular and disconnected ditches near the wet-weather springs, but prior to 1903 these springs only produced running water during wet seasons, and it did not appear that the water from the springs reached Rait's land through any definite channel. When the freshets of 1903 came the water broke over the banks of the artificial ditch connecting the two creeks, near an old road. When that happened it cut a ditch or channel down through the depression by the springs on Furrow's land and to Rait's farm. In one of its findings the court states particularly the character of the channel and stream in question:

"From about ten or fifteen feet from where the water left the old road to the east line of plaintiff's land there is a visible, well-defined channel, cut through the turf, with banks, through which water has been

continually running since the said floods of 1903. This water comes from the plaintiff's land and not from the hills. There are no visible springs from which the water comes. It either originates from springs invisible, in the bottom of the ditch, or it oozes or seeps out of the soil. From the evidence I am unable to tell which. It is a continuous stream, from about ten feet from the said old road to the east side of plaintiff's land, and it increases in volume as it approaches defendant's line. At defendant's line the stream is sufficient to carry over onto the defendant's land as much as a half a barrel of water every minute."

The water runs about 1200 feet in the channel through Furrow's land and over to Rait's land, with a descent of six and one-half feet. Where the stream reaches Rait's land he built an embankment which throws the water back upon Furrow's land, to the latter's damage. The water finally finds its way around the embankment and into a large hole on Rait's land on the opposite side from where the stream strikes the embankment, and extending eastward fifteen or twenty feet. From the east end of this hole there is no regular channel worn by the water, but there is a depression extending eastward. Rait has constructed an artificial ditch from the hole, which carries the water beyond his land. Although the water has continued to run in the stream since the spring of 1903, it was shown that for a considerable part of the time the rainfall has been below normal for the same months of many years. In conclusion the court found that the channel or stream across which Rait constructed the embankment is a natural watercourse, and that the embankment obstructing the watercourse is a nuisance which should be abated, and this was the judgment rendered.

*Humphrey & Humphrey*, for plaintiff in error.

*Thomas Dever*, and *Roark & Roark*, for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: Is the stream in question a natural watercourse? If it is, the embankment which obstructs its flow is a nuisance which was properly enjoined; but, on the other hand, if it is a vagrant outburst, which temporarily overflows the surface of the land, it is to be treated as surface-water—a common enemy against which Rait was entitled to fence. A watercourse consists of a channel, with banks, and bed, and running water. There must be a source of supply, a defined channel, and permanence of flow. In *Gibbs v. Williams,* 25 Kan. 214, 37 Am. Rep. 241, a general definition was given:

"Again, for a watercourse there must be a channel, a bed to the stream, and not merely lowland or a depression in the prairie over which water flows. It matters not what the width or depth may be, a watercourse implies a distinct channel, a way cut and kept open by running water, a passage whose appearance, different from that of the adjacent land, discloses to every eye on a mere casual glance the bed of a constant or frequent stream." (Page 220. See, also, *Palmer v. Waddell,* 22 Kan. 352; *U. P. Rly. Co. v. Dyche,* 31 Kan. 120, 1 Pac. 243; *K. C. & E. Rld. Co. v. Riley,* 33 Kan. 374, 6 Pac. 581; *C. K. & W. Rld. Co. v. Morrow,* 42 Kan. 339, 22 Pac. 413; *C. K. & N. Rly. Co. v. Steck,* 51 Kan. 737, 33 Pac. 601; *Railway Co. v. Scott,* 71 Kan. 874, 81 Pac. 1131.)

East creek, the stream in question, has a well-defined channel, with bed and banks, in which there has been a steady flow of water since the early part of 1903. Prior to that time the upper part of that stream, which drained the hill country, had a well-defined course, with banks, until it reached the bottom-land, from which place it passed down a depression in Furrow's land and extending to the land of Rait. In this depression the water followed no distinct course, and there was no well-defined channel. From the facts found it cannot be said that the flow of water through

Furrow's land prior to 1903 constituted a stream with the attributes of a watercourse. Water did issue from some springs, but only in wet weather, and the water which passed down the depression near the springs left no impress of permanent running water. Since the flood of 1903, however, there has been a regular channel, with banks and bed, and the flow of water has been so steady and persistent as to show that the stream has a well-defined and substantial existence.

It is argued that the supply of water is not so permanent in character as to make it a watercourse. The court did find that ordinarily the water in the stream does not come from the hills; that it either comes from invisible springs in the bottom of the channel or from seepage, but from which of the two sources the evidence did not disclose. It is argued that seepage is no more than surface-water, and that, as the court could not say that springs existed, its finding was the equivalent of a holding that there was no permanent supply.

To constitute a watercourse it is necessary that there be a permanent source of supply. (*Barkley v. Wilcox,* 86 N. Y. 140, 40 Am. Rep. 519; *Sally M. Jeffers et al., Appellants, v. Robert N. Jeffers, Respondent,* 107 N. Y. 650, 14 N. E. 316; *Gregory v. Bush,* 64 Mich. 37, 31 N. W. 90, 8 Am. St. Rep. 797.) The source may be springs (*Pyle v. Richards,* 17 Neb. 180, 22 N. W. 370; *Mitchell v. Bain et al.,* 142 Ind. 604, 42 N. E. 230; *Wolf v. Crothers,* 21 Pa. Co. Ct. 627), or it may be surface-water (*Arthur v. Grand Trunk R. W. Co.,* 22 Ont. App. 89, 95; *Beer v. Stroud,* 19 Ont. 10; *McKinley v. Chosen Freeholders of Union Co.,* 29 N. J. Eq. 164; *Kelly v. Dunning,* 39 N. J. Eq. 482; *Eulrich v. Richter,* 41 Wis. 320; *Barnes v. Sabron,* 10 Nev. 217; 2 Farnham, Waters & Water Rights, § 457; Gould, Waters, 3d ed., § 263), or a pond formed by surface-water (*Neal v. Ohio River R. Co.,* 47 W. Va. 316, 34 S. E. 914).

If, as the court found, the flow of water is continuous and has the element of permanence, it is imma-

Rait v. Furrow.

terial whether it reaches the channel by seepage or from springs. It is enough that there is a living source—a steady supply which is regularly discharged through a well-defined channel made by the force of the waters. Whether the water comes from a spring, subterranean vein, or surface-water, it becomes a watercourse from the point where it comes to or collects on the surface and flows in a well-defined channel or bed, with such banks as will ordinarily confine the water and cause it to run in a definite and certain direction. The supreme court of Ohio, in defining surface-water and its transition into a watercourse, said:

"Surface-water is that which is diffused over the surface of the ground, derived from falling rains and melting snows, and continues to be such until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, whether derived from the surface or springs; and it then becomes the running water of a stream, and ceases to be surface-water." (*Crawford v. Rambo,* 44 Ohio St. 279, 282, 7 N. E. 431.)

In *Mitchell v. Bain et al.,* 142 Ind. 604, 42 N. E. 230, it was remarked:

"Even surface-water becomes a natural watercourse at the point where it begins to form a reasonably well-defined channel, with bed and banks, or sides and current, although the stream itself may be very small, and the water may not flow continuously. Gould, Waters, § 263; *Churchill v. Lauer,* 84 Cal. 233, 24 Pac. 107." (Page 616.)

The question is not to be determined alone from the origin of the water, for streams may be composed wholly of surface-water or that which falls in the shape of rain or snow. In *Arthur v. Grand Trunk R. W. Co.,* 22 Ont. App. 89, it was said:

"If a stream is traced up toward its source a point will always be reached where it ceases to be definable by a bed and banks; but until that point is reached it must be a watercourse, whether its origin be a spring, or several springs, or the rain or snowfall of a district collected naturally, and flowing away for the first time

in a visible course or channel. All our lakes, rivers and streams have their source in the clouds of the sky, precipitated in the form of rain or snow, and the sole question in every case is, whether the water thus precipitated has formed for itself a visible course or channel, and is of sufficient magnitude or volume to be serviceable to the persons through or along whose land it flows. It is immaterial that it may be intermittent in its flow, or that at certain seasons of the year there may be little or even no flow of water." (Page 94.)

So it has been held that when surface-waters collect into a pond which is of a permanent character they cease to be surface-waters. (*Neale v. Ohio River R. Co.*, 47 W. Va. 316, 34 S. E. 914; *Schaefer v. Marthaler*, 34 Minn. 487, 26 N. W. 726, 57 Am. Rep. 73; *Alcorn v. Sadler*, 66 Miss. 221, 5 South. 694.)

It is plausibly contended that the water has not flowed in the stream for such a length of time as to indicate permanence; that as it has not flowed from time immemorial it cannot be regarded as an ancient watercourse. It is not essential that a watercourse shall have all the characteristics and attributes of every other watercourse. (2 Farnham, Waters & Water Rights, § 455.) It is not uncommon for a stream to leave its channel and make for itself a new course. The test is not the age of the stream, nor the length of time its waters have followed a particular channel, but it is whether it has the characteristics of permanence. The waters of the Missouri river frequently leave portions of its accustomed bed and cut a new channel far away from the former one, and occasionally they shift back again and pass through the old channel. In such cases the new channel does not require great age to give it the character of a watercourse, and there can be no distinction between that river and a running stream of less magnitude. East creek has been a regular flowing stream in all seasons, wet and dry, since the spring of 1903. While the volume of water is not large, it is large enough to be serviceable, as it flows at the rate of half a barrel a minute, and to throw it

back upon the land of the plaintiff would necessarily
work great injury. If it had only flowed during fresh-
ets, or in wet seasons, there would be more reason to
treat it as a temporary stream; but the matter of per-
manence was a question of fact for the trial court, and,
although its existence originated in a flood, and only a
year or two ago, the facts stated appear to be sufficient
to support the finding of the court.

The fact that East creek does not continue in a
definite channel across Rait's land and until it reaches
the river is pressed upon the attention of the court. It
is not shown to flow through a well-defined, natural
channel much beyond Furrow's land, nor that it dis-
charges into another watercourse. But is it important
or necessary that a watercourse should extend to and
find its outlet in another watercourse, and thence to
the sea? Ordinarily a stream of water, flowing in a
definite channel, discharges itself into a river or some
other watercourse, but the fact that a stream may
spread out over the land, percolate into the soil, or lose
itself in some subterranean channel, does not deprive
the part which flows regularly through a channel of
its character as a watercourse. In a Vermont case it
appeared that water from springs ran down a hillside,
formed a small pond, and thence by a distinct course
ran down a ravine to a point where it was discharged
upon a meadow. Ordinarily the stream was only two
or three inches deep and about six inches wide, and,
while the volume of water was small, its distance very
short, and its outlet the unbroken surface of a meadow,
it was held to be a watercourse. (*Wm. P. Hawley &
N. P. Hawley v. Henry W. Sheldon*, 64 Vt. 491, 24 Atl.
717, 33 Am. St. Rep. 941.)

Subterranean currents of water emerge from the
ground and flow through surface channels, and, again,
running streams sometimes sink away and are no
longer traceable on the surface. The outlet of a stream
may be unknown, but if its course on the surface—so
far as it runs—is well defined, and has the element of

permanence, it must be regarded as a watercourse, and its surface flow at least cannot be interrupted nor diverted from its natural channel.  In *Mansford v. Ross,* 4 N. Z. L. R. 290, it was held that where a stream which empties itself into a swamp, all definite channel being lost, and there is a channel emerging from the other side, the stream running into the swamp is a watercourse, and the owner of the land through which that stream runs cannot divert the water and defeat the riparian rights of those on the lower stream on the other side of the swamp.  In *Mitchell v. Bain et al.,* 142 Ind. 604, 42 N. E. 230, it was said:

"A stream does not cease to be a watercourse and become mere surface-water because at a certain point it spreads over low ground several rods in width and flows for a distance without a defined channel or banks before flowing again in a definite channel."  (Page 614. See, also, *Ferris v. Wellborn,* 64 Miss. 29, 8 South. 165; *Hebron Gravel Road Company v. Harvey,* 90 Ind. 192, 46 Am. Rep. 199; *Wash. Water Co. v. Garver,* 91 Md. 398, 46 Atl. 979; *Case v. Hoffman and others,* 84 Wis. 438, 54 N. W. 793, 20 L. R. A. 40, 36 Am. St. Rep. 937.)

But whatever may be the rule as to subterranean currents or waters passing through the ground by percolation, there can be no question but that surface-currents of living water, running in defined channels, and having the element of permanence, are to be regarded as watercourses, whether the outlets are through defined channels over the surface or by subterranean channels, or even by percolation through the earth.  In *Strait v. Brown,* 16 Nev. 317, 40 Am. Rep. 497, it was decided that a creek having its source in springs, which ran a short distance through a natural surface-channel and then discharged into a large slough which had no natural surface-outlet, was a watercourse, and that the waters running in the surface-channel could not be diverted to the injury of the lower owners.  The character of the outlet beyond the land of Furrow cannot materially affect the character of the stream flowing

through Furrow's land, and that stream, under the findings of the trial court, must be regarded as a natural watercourse.

The judgment of the district court is therefore affirmed.

All the Justices concurring.