Case vs. Hoffman and others.

| 100 | 314 |
|---|---|
| 103 | 218 |
| 103 | 303 |
| 103 | 549 |
| 104 | 353 |
| 104 | 480 |
| 100 | 314 |
| 105 | 8 |
| 105 | 445 |
| 100 | 314 |
| 107 | 73 |
| 100 | 314 |
| s44 LRA | 728 |
| 45 LRA | 218n |
| 52 LRA | 305n |
| 53 LRA | 609n |
| 100 | 314 |
| 115 | 5128 |
| 115 | 5282 |
| 100 | 314 |
| 117 | 8366 |

CASE, Respondent, vs. HOFFMAN and others, imp., Appellants.

*May 27, 1897 — June 23, 1898.*

(1–4) *Appeal: Disqualification of judge who previously determined the same matter: Void judgment: Waiver: Reargument, when ordered.* (5) Res adjudicata: *Decision on demurrer.* (6–11) *Watercourses: Evidence: Substitution of canal: Right to water therefrom: Parol contract: Statute of frauds: Notice: Diversion of water: Injunction: Duty to maintain canal: Covenants.*

1. In an action to restrain the diversion of water from a ditch or canal on the grounds that it was a watercourse and that the right to have the water flow therein had been acquired under a fully executed oral contract with defendants' grantors, an order of the circuit court sustaining a general demurrer to the complaint was reversed on appeal on the ground that the facts alleged showed the existence of a natural watercourse, but it was not decided whether plaintiff had any rights under the alleged contract. On the trial before another circuit judge he found that an ancient watercourse flowed in the ditch and that the oral contract had been made and executed as alleged, and gave judgment for the plaintiff. On appeal from that judgment it was reversed on the grounds that the evidence did not show a natural watercourse and that the contract proved (which was the same as that alleged in the complaint) was of no validity. *Held,* that in respect to the contract this was a decision of a matter which had been determined by the circuit judge who sustained the demurrer, and hence that he — having since become a justice of the supreme court — was disqualified, under sec. 2580, R. S. 1878, to participate in the decision involving that matter. CASSODAY, C. J., and MARSHALL, J., are of the opinion that as to the existence of the watercourse, also, the question presented on the appeal from the judgment was the same as that presented on the earlier appeal, and hence that the judge from whom that appeal was taken was disqualified to take part in the decision of the supreme court upon any branch of the case upon the later appeal.

2. Where a judge disqualified by statute to take part in the decision of a cause participates in the decision thereof — even though he acts simply as one of a bench composed of several judges — the judgment rendered is *coram non judice* and void, especially when, as in this case, the disqualified judge gave the casting vote and decided the cause.

Case vs. Hoffman and others.

3. The disqualification of the judge in such a case cannot be waived or removed even by the express consent of the parties. *Walker v. Rogan*, 1 Wis. 597, distinguished and limited.

4. Where, upon an appeal, the justices of the supreme court who were qualified to sit were equally divided, and the deciding vote for reversal was cast by a justice disqualified to take part in the decision, the court, upon vacating the void judgment of reversal, may either enter judgment of affirmance or order a reargument. If a reargument is ordered, the case stands as if no judgment had in fact been entered.

5. The decision by the supreme court of questions arising upon a general demurrer to a complaint, so far as it is applicable to the facts subsequently established on a trial, is the law of the case by which the court must be governed upon an appeal from the judgment rendered on such trial. Thus, in this case, the facts alleged in the complaint having been held, on appeal from an order sustaining a demurrer, to describe a watercourse, and the trial court having thereafter found such facts to exist, following closely the language of the complaint and of the decision thereon, the sufficiency of such findings, if supported by the evidence, to establish the existence of the watercourse is *res adjudicata* upon an appeal from the judgment entered thereon.

6. The evidence in this case is *held* to sustain findings by the trial court of the facts showing the existence of a watercourse through a marsh, within the former decision (84 Wis. 438). WINSLOW and PINNEY, JJ., dissent.

7. Defendants' grantors dug a ditch or canal across plaintiff's land without his consent, which became a substitute for a natural watercourse, and diverted from such land a great amount of water which naturally came thereto. In times of high water large quantities of logs and débris escaped from the canal and were deposited upon plaintiff's land. Plaintiff made a claim for damages, and then entered into a parol agreement with said grantors by which he agreed to permit the canal to remain as constructed and to forego his claim for damages, and they agreed to build a lateral waste-water ditch from which plaintiff was to receive so much water as was reasonably necessary for cranberry culture on his land; and the lateral ditch was build accordingly. *Held*, that as between the parties thereto this was a valid and binding contract, enforceable in equity.

8. The location of the canal and plaintiff's open enjoyment of the rights and privileges appurtenant thereto at the time when defendants acquired their grantors' interests therein was notice to defendants of his rights, and they were also chargeable with no-

tice that the waters of a natural stream had been diverted and
could not be restored to their former course. Their rights under
such purchase were therefore subject to the duties and obligations
imposed upon their grantors, so far as the same were disclosed by
the situation, and they had no right to alter the conditions, by
changing the location and course of the ditch above plaintiff's land,
so as to divert the flow of water entirely therefrom. WINSLOW and
PINNEY, JJ., are of the opinion that the parol contract with de-
fendants' grantors did not fasten a perpetual servitude upon their
lands, in whosesoever hands they might come, to furnish water to
the plaintiff through the artificial canal.

9. The canal having become a substitute for a natural watercourse, and
the plaintiff being entitled to receive therefrom so much water as
was reasonably necessary for cranberry culture on his land, defend-
ants should be required to restore the canal to the condition in
which it was before their unlawful interference with it, and be re-
strained from diverting water from the canal or lessening its flow,
and should be required also to build a bulkhead to hold back the
water to which plaintiff was entitled, made necessary by their use
of the water below plaintiff's land, and to maintain such bulkhead
so long as they continued such use of the water.

10. But, the delivery of water to plaintiff through the canal instead of
as it came in a state of nature being an advantage to him, and
there being nothing in his contract with defendants' grantors re-
quiring them to maintain the canal perpetually, and it not appear-
ing that defendants are the owners of all the lands through which
the canal passes before reaching plaintiff's land, and the ten years
having expired during which, under the franchise acquired from
their grantors (ch. 271, Laws of 1883), defendants had power to
handle, own, and control the canal, defendants cannot be charged
with any obligation to maintain the canal above plaintiff's land;
and, in case defendants should abandon their privileges and their
use of the water in the canal below plaintiff's land, they should be
freed from any obligation to maintain the canal at any point.

11. An agreement by defendants, in the instrument of assignment by
which they acquired their grantors' rights and franchises in respect
to the canal, to keep and maintain the canal in proper repair, was
a covenant personal to said grantors and cannot be invoked in
favor of plaintiff to compel the perpetual maintenance of the canal
by defendants.

APPEAL from a judgment of the circuit court for Jackson
county: W. F. BAILEY, Circuit Judge. *Affirmed in part; re-
versed in part.*

The following statement of the facts was prepared by Mr. Justice NEWMAN in connection with the opinion filed by him on September 28, 1898:

This is an action in equity to restrain the defendants from diverting the course of a ditch or alleged watercourse from the plaintiff's lands, and to enforce the performance by the defendants of an alleged contract to maintain the ditch in its present location on plaintiff's land, for the benefit of plaintiff's cranberry marsh.

The parties are all owners of land on a large marsh, many miles in extent and covering the greater part of a government township of land. The marsh is generally nearly level, but dips to the east and to the south, but more to the east than to the south. The land is adapted to the culture of cranberries, and is valuable for that purpose, but is of little worth for any other purpose. The surface of the marsh is principally covered by a growth of moss, several inches in depth, with some grass and other vegetation, above a layer of peat of considerable but varying thickness, and all resting on a substratum of sand. The marsh is, in considerable part, made and fed by springs which arise towards the northeastern part of the township, and flow in channels into and form a small lake of some forty acres in area, called "Big Lake." The waters of the lake flow out, through depressions in its low banks, to the east and to the south. One such depression to the southeast bears some resemblance to a natural channel of a watercourse, for a short distance from the lake, where the apparent banks subside into and are lost in the general surface of the marsh. The plaintiff's lands lie to the southeast of the lake, a distance of something over two miles. This depression, or natural channel from the lake, is lost and disappears about two miles above plaintiff's land. The waters disappear from sight beneath the moss and vegetation, if not beneath the surface of the marsh, to reappear at a distance of a mile or more below the plaintiff's land, where they

are gathered together and form a distinct watercourse, which is known as the "West Branch of Beaver Creek." In this distance of three miles or more intervening the points where the supposed channel from Big Lake disappears and the point where the "West Branch" becomes a definite stream, there is nothing which resembles the "well-defined and substantial existence" of a watercourse. There is no channel, with bed and banks. At most seasons of the year, there is no appearance of water above the vegetation. At times of melting snow and great rains, water spreads over a great part of the marsh for several miles in breadth, not only over the plaintiff's land, but over the lands of adjoining proprietors, to the north and to the south of him. This water does not flow from or across the marsh in any defined current or channel, but stands in depressions until it disappears by evaporation or percolation. In such places the vegetation is killed, but the surface of the marsh is not broken by a water channel, nor do these places have, in any respect, the appearance of the continuous channel of a watercourse. They are widely dispersed over the surface of the marsh, and not in such relation to each other as to indicate a continuous channel across the marsh. They were designated by some of the surveyors as "pot holes." Some of these "pot holes" were upon the plaintiff's land, some were to the north of it, some were to the south of it. There were no more distinct evidences of the existence of a watercourse across the plaintiff's land than upon the lands of adjoining proprietors to the north or to the south, while the general dip of the marsh would seem to indicate that the larger part of the water would, in natural conditions, pass to the north.

In the years 1880 and 1881, Messrs. D. A. and C. A. Goodyear dug a ditch through a part of this marsh, above the plaintiff's lands, extending to Big Lake. The primary object of this ditch was to enable the Goodyears to float pine sawlogs to their sawmill, which was situated near the southeast-

ern part of the marsh.   In 1883, the legislature, by chapter
271 of that year, sanctioned the digging of the ditch, and
gave a franchise to maintain it for a period of ten years.
The ditch was of sufficient magnitude to successfully float
logs to the mill.   In its course the ditch ran through a corner
of land belonging to the plaintiff.   In times of freshet it
gathered more water than would be contained by its banks.
It would then overflow, to the damage of adjoining owners
of the marsh.   It became convenient to the Goodyears to
accommodate this overflow by a lateral ditch across the land
of the plaintiff.   In October, 1885, they made an oral agree-
ment with the plaintiff, whereby they agreed to permit the
plaintiff to take water for his cranberry culture from the
principal ditch, in consideration of his permission to dig the
lateral ditch upon his land.   This agreement was not re-
duced to writing until February 21, 1891, when the Good-
years gave the plaintiff a statement, in writing, that such an
agreement had been made, and the substance of its provis-
ions.  The plaintiff's privilege and the consideration are stated
as follows:   "*Russell Case* was to be permitted to have the
privilege of using such amount of water from the said log-
ging ditch as might be necessary for his use upon his said
premises in the cultivating and raising of cranberries, when-
ever the same might be needed for such purpose.   The con-
sideration for the said privilege of using such water was the
permission granted by said *Russell Case* to said D. A. and
C. A. Goodyear, to enter upon his said land, and to construct
a ditch through and over the same; the said ditch to be used
as an outlet in times of high water, for the safety of certain
dams,   .   .   .   and to prevent overflow on the adjacent
cranberry marshes."

The Goodyears constructed the contemplated ditch, and
the plaintiff used water from the logging ditch until near
the time of the commencement of the action.   The Good-
years used the ditch for the floating of logs to their mill

until the supply of logs was exhausted, in 1888. In October, 1889, they sold the ditch to the defendant *Hoffman,* who bought it with the design to use it to supply water for the irrigation of cranberry lands on the marsh belonging to him and the other defendants. The other defendants had some interest in the purchase of the ditch. *Hoffman* agreed with the Goodyears to keep the ditch in repair, to furnish water to irrigate Goodyears' cranberry lands, and to save and keep the Goodyears "free and harmless from all cost, liability, or damage on account of said ditch, or the construction, maintenance, and repair thereof, or for any want of repair thereof." There was a succession of dry seasons, which made a supply of water for the irrigation of cranberry lands in that neighborhood very desirable. The defendants deemed it to be to the advantage of their cranberry interests on the marsh to change the course of the ditch where it crossed the plaintiff's land. There was some claim that he took more water from the ditch than he was entitled to. In 1891 they commenced the digging of a new ditch across the lands of the defendant *Stickney,* above the plaintiff's land, with the intention to divert the ditch entirely from the plaintiff's land. This action was then brought to restrain the defendants from making the proposed change in the course and location of the ditch, and to compel the defendants to maintain and keep it in repair in its old location, so as to furnish the plaintiff with so much water as should be needed for the use of his cranberry marsh.

The trial court gave judgment, whereby it permanently enjoined the defendants from changing the course and location of the ditch, and directed them to maintain and keep the ditch in repair, so that the plaintiff could *perpetually* draw therefrom a supply of water for his cranberry land. From this judgment the defendants appeal.

For the appellants there were briefs by *Bushnell, Rogers & Hall,* and oral argument by *A. R. Bushnell* and *F. W. Hall.*

For the respondent there was a brief by *La Follette, Harper, Roe & Zimmerman*, and oral argument by *R. M. La Follette* and *G. E. Roe*. They argued, among other things, that the facts disclosed in the record establish a natural watercourse. *Hinkle v. Avery*, 88 Iowa, 47; *Rummell v. Lamb*, 100 Mich. 424; *Lux v. Haggin*, 69 Cal. 255; *Bunting v. Hicks*, 7 Reports, 293; 4 Lead. Cas. Am. Law of Real Prop. 309 and notes. Even if the water in question does not technically constitute a watercourse, the plaintiff could still enjoin the defendants from diverting the same from his land. Courts have refused to apply the rule applicable to surface water where the water was a benefit and not an injury. *Abbott v. K. C., St. J. & C. B. R. Co.* 83 Mo. 272; *O'Brien v. St. Paul*, 25 Minn. 335; *Chesley v. King*, 74 Me. 174; Washb. Easements, 49; *Swett v. Cutts*, 50 N. H. 439; *McClure v. Red Wing*, 28 Minn. 186; *Pettigrew v. Evansville*, 25 Wis. 229; *Hoyt v. Hudson*, 27 id. 659. The Goodyear contract was one that a court of equity will enforce. *Morse v. Copeland*, 2 Gray, 302; *Van Ohlen v. Van Ohlen*, 56 Ill. 529; *Rerick v. Kern*, 14 Serg. & R. 267; *Coffman v. Robbins*, 8 Oreg. 278; *Veghte v. Raritan W. P. Co.* 19 N. J. Eq. 142; *Olmstead v. Abbott*, 61 Vt. 281; *Newcomb v. Royce*, 42 Neb. 323; *Bunting v. Hicks*, 7 Reports, 293.

The following opinions were filed September 28, 1898:

NEWMAN, J. The main inquiry on this appeal is whether the evidence establishes the existence of an ancient watercourse across the plaintiff's land, which was diverted into the logging ditch which was dug by the Goodyears, or whether the water which was gathered into and conducted by that ditch was mere surface and percolating water; for, although the plaintiff does not now complain of the digging of the ditch, but, on the contrary, finds it to be to his advantage and desires it to be maintained and kept in repair in its present location upon his land, still the question whether the

ditch diverted an ancient watercourse, or is a mere conduit
of surface water, has an important bearing, and may be con-
trolling, upon the question of the right of the defendants to
change the course and location of the ditch so as that it
shall not cross the plaintiff's land. If it was, in truth, an
ancient watercourse, it is the right of the plaintiff that it be
allowed to flow through his land as it was accustomed afore-
time to flow, or, at least, in the substituted channel which
the defendants have provided for it. While, on the other
hand, if it be mere surface water which is gathered into and
conducted by the ditch, its diversion from his land is not
such a wrong as affords him ground for an action. If he is
damaged by it, it is *damnum absque injuria*. So, the ques-
tion whether it was an ancient watercourse which was di-
verted by the Goodyear ditch is the question upon which
the case turns, and it is a question of no inconsiderable prac-
tical importance to the parties to the present action, not
only, but to all that portion of the public which is interested
in the culture of cranberries.

Cranberry marshes are improved in various ways,— if too
wet, by the drainage of the surface and percolating water;
if too dry, by the storage of the surface and percolating
water by means of dams, to be used, at the proper time, in
irrigation, or to protect the crop from untimely frosts by
inundation. If it shall be deemed that a marsh, through
which a considerable volume of water is strained by percola-
tion, and on the surface of which surface water at times
stands or flows, is, in its entire breadth, a natural water-
course and subject to the rules of use and diversion appli-
cable to watercourses, the decision will have an important
effect on the improvement of cranberry marshes. It will
greatly restrict the mode and possibility of such improve-
ment. This marsh is not, practically, unlike cranberry
marshes in general. Such marshes are usually formed and
fed by springs which flow in along the margin, or from

higher ground, as rills or small watercourses. The water is strained, by percolation, through the marsh, supplying moisture as it passes, and, at the lower end, assembles, to constitute again a watercourse. The practical question seems to be, Is this water, in its entire course through the marsh, to be deemed to be within the channel of an ancient watercourse, and is the entire marsh to be deemed to be within the banks of that channel?

What is essential to constitute a watercourse is well settled and defined by the decisions of this court: " It must be a stream *usually* flowing in a particular direction, though it need not flow continually. It may sometimes be dry. It must flow in a definite channel, having a bed, with sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over a tract of land, occasioned by unusual freshets or other extraordinary causes." *Hoyt v. Hudson,* 27 Wis. 656; *Fryer v. Warne,* 29 Wis. 511; *Eulrich v. Richter,* 37 Wis. 226; *Lessard v. Stram,* 62 Wis. 112. The bed is the characteristic which distinguishes a watercourse from mere surface drainage, and from percolating water. Gould, Waters, § 41. " In general, in order to constitute a watercourse, the channel and banks formed by the flowing water must present to the eye, on a casual glance, the unmistakable evidences of the frequent action of running water." Id. § 264. " It must have a well-defined and substantial existence." *Eulrich v. Richter, supra.*

Nothing which is said in the opinion on the former appeal in this case (84 Wis. 438) is necessarily out of harmony with this definition of a watercourse. The question there decided arose on a demurrer to the complaint. It was whether the complaint stated facts which showed the existence of an ancient watercourse across the plaintiff's land. The complaint did not, in terms, allege the existence of such a watercourse, but stated facts from which it was claimed the court

should infer its existence. The only question presented by that appeal was whether the court could infer the existence of such watercourse from the facts pleaded. On this point, after quoting from the complaint, the court say (page 450): "Would it not be idle and hypercritical to say: 'But this description does not use the words "bed and banks" and "current,"—the language of the books in describing a watercourse'? These waters in such volume could not flow continuously, *always in a distinct and plainly marked channel, well defined and established*, without making for themselves a bed and banks or sides to the stream in the places mentioned, one of which is on the land of the plaintiff. It is a most reasonable, necessary, and inevitable consequence by the laws of nature. Such a body of water, gathered into a stream and flowing in one channel continuously, could not help from cutting for itself in suitable soil or high ground a watercourse, with banks, bed, and current, any more than it could help from running down an inclined plane." The ground upon which the decision went is evident from this language. It is that the complaint does, in effect, allege that a considerable stream of water had been accustomed to flow *continuously, always in a distinct and plainly marked channel, well defined and established*, across the plaintiff's land, and that such continuous *flowing in one channel* had *inevitably* made a channel, with bed and banks; hence that the complaint by irresistible inference alleged facts which would establish the existence of a watercourse. The law of this case, as established by that decision, is that upon proof of the facts deemed to be alleged, the plaintiff will be entitled to judgment.

It is not here questioned that such a volume of water, *flowing continuously* across the plaintiff's land, *in a distinct and plainly marked channel, well defined and established*, would constitute a watercourse. The question now presented is whether the evidence given on the trial did estab-

lish the existence of such a stream, flowing continuously or usually across the plaintiff's land, in a distinct and well-defined channel. There is no conflict or uncertainty in the evidence bearing upon this question, nor are the facts as found by the trial court difficult to reconcile with the evidence. The court finds that the water from Big Lake was discharged by a channel or outlet to the southeast, and thence, "though not by a continuous surface channel, but with a definite and clearly marked *flow*, in a southeasterly direction," across the intervening lands, into Beaver Creek; "that though, under natural conditions, the water spreads out in places and flows over and through the peat and moss, . . . it in many places made for itself channels, with bed and banks, some of which channels *still exist.*" The evidence shows that this condition of the marsh was more than three miles long, and more than two miles wide. Some of these supposed channels were upon the plaintiff's land, some were upon the lands to the north, and some to the south, of plaintiff's land. They were not continuous in any particular direction, as being parts of the same continuous channel. The evidence shows with satisfactory clearness that these supposed channels were in truth no channels at all. They were mere depressions in the surface of the marsh, into which surface water gathered and stood until it evaporated or found way through the soil by percolation. The moss and vegetation were killed by the standing water, but there was no evidence of erosion by running water. These pseudo and discontinuous channels were widely dispersed over the marsh, and bore no such relation to each other as to indicate that they had constituted together one continuous channel of a watercourse across the marsh. Nor are they more numerous on the plaintiff's land than they are upon the lands to the north and to the south of his. If these are to be deemed channels of streams, then this marsh is the seat of many watercourses, and it would be difficult to iden-

tify and locate one as the plaintiff's watercourse. It is inconceivable that, if even a considerable part of the water which was gathered into the logging ditch had been accustomed to flow continuously or usually across the plaintiff's land in a definite channel, it should not have made for itself, through that soft and easily eroded soil, a distinct and plainly marked channel, such as would present to the eye, upon a casual glance, the appearance of a continuous watercourse. One would suppose that it would at least have killed the vegetation in the line of its flow. As said by the court in the former opinion, the making of a *distinct and plainly marked channel* for itself was an *inevitable consequence* of such a flow of such a volume of water across the plaintiff's land. The inference is irresistible that there has been no such accustomed and continuous flow of any appreciable current of water, either across the plaintiff's land or across any part of the marsh. In ordinary conditions, there is no appearance of running water upon the surface of the marsh, yet in many places the foot sinks into water beneath the vegetation; but it is not running water and has no appreciable current.

Clearly, this falls far short of establishing such a "well-defined and substantial existence" as is essential to constitute a surface watercourse. If so, which one of all these pseudo and discontinuous channels is the true, definite, and manifest watercourse? Nor is there evidence of the existence of such a subsurface stream as is recognized to be a watercourse. To be such, a subsurface stream must follow a definite and *known* channel. Subsurface currents or percolations which do not follow definite and known channels are not governed by the rules respecting the use and diversion of watercourses, but, although of considerable volume, are treated in law the same as surface water. The water is deemed to be a part of the soil itself, and, to the same extent, subject to whatever disposition the owner of the land

may choose to make; and, if some damage happens to an adjacent proprietor by the interception of some subterranean current, that is *damnum absque injuria*. This is established by the great weight of authority. *Goodale v. Tuttle*, 29 N. Y. 459–466; *Delhi v. Youmans*, 45 N. Y. 362; *Phelps v. Nowlen*, 72 N. Y. 39; *Barkley v. Wilcox*, 86 N. Y. 140–147; *Bloodgood v. Ayers*, 108 N. Y. 400; *Greenleaf v. Francis*, 18 Pick. 117; *Davis v. Spaulding*, 157 Mass. 431; *Bassett v. Salisbury Mfg. Co.* 43 N. H. 569; *Swett v. Cutts*, 50 N. H. 439; *Chatfield v. Wilson*, 28 Vt. 49; *Roath v. Driscoll*, 20 Conn. 533; *Frazier v. Brown*, 12 Ohio St. 294; *Hanson v. McCue*, 42 Cal. 303; *Southern P. R. Co. v. Dufour*, 95 Cal. 615; *Gould v. Eaton*, 111 Cal. 639; *Wheatley v. Baugh*, 25 Pa. St. 528; *Haldeman v. Bruckhart*, 45 Pa. St. 514; *Coleman v. Chadwick*, 80 Pa. St. 81; *Mosier v. Caldwell*, 7 Nev. 363; *Taylor v. Welch*, 6 Oreg. 198; *Chesley v. King*, 74 Me. 164; *Ocean Grove Camp-Meeting Asso. v. Comm'rs of Asbury Park*, 40 N. J. Eq. 447; *Acton v. Blundell*, 12 Mees. & W. 324; *Rawstron v. Taylor*, 11 Exch. 369; *Chasemore v. Richards*, 7 H. L. Cas. 349.

There is one passage in the former opinion which may seem on first view to be at variance with this statement of the rule of percolating waters, as applicable to this case; but it is believed that, on analysis, it will appear that there is no necessary conflict. The passage immediately follows the portion above quoted. It is: "Admit that the complaint shows that this stream spreads over wide reaches of marsh and swamp lands, and percolates the soil in many and most places between Big Lake and Beaver Creek, or in all places except those mentioned, where the ground was suitable for cutting a well-defined channel, as above described; according to the above authorities, such spreading of a stream through marshes and swamps, on or below the surface, does not militate against its being a watercourse in every essential particular, if it can be traced or identified as the same stream." This is plainly ambiguous. What is intended by

the phrase " can be traced or identified as the same stream" ?
Did the court intend to decide that, if the water which
passed through the marsh in invisible and unknown chan-
nels could be traced or identified as the same water which
flows through Big Lake, then it can be deemed a watercourse
throughout that long and wide interval where the stream
is lost to vision, and subject to the rules applicable to sur-
face watercourses?   Or did it mean that, if the water which
forms and flows through the west branch of Beaver Creek
can be traced or identified as the same water which flows
through Big Lake, it should be deemed to be the same stream,
with the consequences which flow from such identity.   If
the former was intended, it is absurd; if the latter, it is in-
consequential.   The authorities referred to by the court as
" the above authorities " seem to make it reasonably clear
that the court intended the latter proposition.   The author-
ities cited are Gould, Waters, § 264 (evidently a miscitation
for section 263); *Munkres v. K. C., St. J. & C. B. R. Co.* 72
Mo. 514; *Hebron Gravel Road Co. v. Harvey,* 90 Ind. 192;
*Robinson v. Shanks,* 118 Ind. 125.   The passage cited from
Gould on Waters is: " But if a well-defined natural stream
empties into a swamp or lake, where all definite channel is
lost, and emerges again into a well-defined channel below,
it is a question of fact, dependent upon the extent of the
swamp or lake, whether it is the same stream; and if it is,
the owners of land upon the lower stream have riparian
rights, and the owner of land on the stream above the swamp
or lake is not entitled to divert water therefrom to their in-
jury."   The cases cited are not in point.   No one of them
is a case of a stream lost in a swamp.   The rule stated is
not, by its terms, of universal application.   Whether it is to
be applied in a particular case depends, it seems, upon the
extent of the particular swamp.   It seems to be implied that
it is inapplicable in the case of a swamp which is of large
extent.   It seems that a swamp which is several miles in

length, and of equal breadth, would properly be classified as a large swamp.  So, it would seem that the rule is not properly applicable to the marsh exhibited in the proofs, but, if it be deemed applicable, it brings us no nearer to a solution of the question in controversy; for it is entirely irrelevant to that controversy if the stream which issues from the marsh below is the same stream which enters it from Big Lake, for neither is the plaintiff a riparian owner on the lower stream, nor does the defendants' ditch divert water from the lower stream.  It simply leads the water which it collects to the defendants' cranberry lands or other parts of the marsh, where, after use, it is left to find its way through the marsh, to contribute to the lower stream.

The court was considering a complaint which it deemed to allege, by necessary inference, a stream of water continuously flowing across the marsh, in a definite and plainly marked channel, except in certain places where the soil was unfavorable to the cutting of a channel, which could be traced and identified with both the upper and the lower stream. It was not considering the actual stream as it appears in the proofs, so utterly lost in the marsh as not to have left a vestige of a true channel to mark the line of its onward course.  No such case was presented by the complaint, no such case was decided.  It would be unwarranted to assume that, in that situation, the court had decided that the lost stream was a watercourse throughout the interval in which it remained lost to sight, between the points of its disappearance in the marsh and its reappearance as the west branch of Beaver Creek.  A decision of the question was uncalled for by the pleadings.  Such a decision would be absurd in law, and disastrous in its consequences.  It would be, in effect, to hold that the entire marsh, in its whole area, is the single bed of a watercourse; for it cannot be known how widely through the marsh the percolating water is dispersed, and no true channel can be definitely located.  Every part

of the marsh is the channel, as much as any part. This is an absurd result. The effect of such a decision would be disastrous, for it would greatly embarrass and limit the possibility of the improvement of such lands. Diligent search has failed to discover even one case which gives support to that proposition.

So, it is considered that the court did not intend, in that decision, to announce any doctrine which is not in harmony with the view which the court now takes on the proofs of the actual situation. The opinion is not, at least necessarily, out of harmony with the present decision. How the court would have decided the question if it had been presented as in the proofs taken on the trial can be properly inferred only from the standpoint of the law itself. Even if, by dubious inference or specious argument, it could be made to seem plausible that the court intended to embrace such a proposition within the scope of its decision, its judgment would not be, to that extent, *res judicata*. A judgment makes only that which was *in issue* and *decided res judicata*. The reasons given by the judges, whether few or many, are not *res judicata*. Nor is the effect of the judgment as an estoppel either restrained or enlarged by the reasons given, nor can its effect as *res judicata* extend to any matter only incidentally cognizable, or which is to be inferred by argument from the judgment. Freeman, Judgments (4th ed.), §§ 249–258; *Williams v. Williams*, 63 Wis. 58–71; *Braun v. Wis. Rendering Co.* 92 Wis. 245. Whatever may have been intended by that passage, it clearly is not here binding on the court as *res judicata*. So, it is considered that the defendants might lawfully dig and maintain their ditch on their own land, and are not liable to the plaintiff, even if the ditch does collect and divert from his land surface and subsurface water which would have come there, whether by surface drainage or by percolation through the soil, but for the ditch. If such diversion caused him damage, it gives

him no ground of action. It is not caused by an unlawful act. It is *damnum absque injuria..*

But, as before stated, the right to construct and maintain the ditch is not the essential point in controversy in the action. It was, nevertheless, needful to be determined, because upon it the point directly in controversy seems necessarily, in great measure, to turn. The plaintiff is willing and desires the ditch to be maintained, as at present located, across his land. It is to his advantage that it be so maintained. It brings to his land a supply of water, which is useful in the prosecution of his cranberry industry, and at the cost of the defendants. The defendants propose to remove the ditch from plaintiff's land, by changing its course so that it shall not cross his land but shall cross the land of the defendant *Stickney,* above the plaintiff's line. This is partly to be relieved of the burden of furnishing water to the plaintiff's cranberry marsh, and partly to better serve their own interests. The action is to prevent the proposed change in the course of the ditch, and to require the defendants to maintain and keep it in repair, in its present location, for plaintiff's benefit. The trial court held and adjudged that the ditch diverted a watercourse, and had become a legal watercourse in its present location, and could not lawfully be diverted to another course, away from the plaintiff's land, without the plaintiff's consent, and that the plaintiff was entitled to have it maintained and kept in repair forever, so that the plaintiff may perpetually receive therefrom water to irrigate his cranberry marsh; and the defendants are forbidden to change the course of the ditch, or to divert its current from the plaintiff's land, and are enjoined to keep the ditch in repair, so that the plaintiff may receive his needed supply of water from it perpetually. This right is claimed for the plaintiff on two principal grounds. (1) That by the diversion of an ancient watercourse the defendants

have established a legal watercourse in the present location of the ditch, which they may not divert to the plaintiff's injury; and (2) that by the Goodyear contract and the assumption of the performance of its stipulations by the defendants, the defendants are under contract obligation to the plaintiff to maintain the ditch and keep it in repair in its present location forever, for the benefit of his cranberry industry.

To determine the first ground on which this claim is founded, it became necessary to ascertain and determine whether it was, in truth and in law, an ancient watercourse which had been diverted into the ditch, and whether it continued to be a legal watercourse in its new course and location, or whether it was the mere diversion and leading away of mere surface or percolating waters; for it may well be that parties who divert a watercourse into and through a new and artificial channel should be deemed only to have established a new course and channel for the same watercourse, which is subject to the same rules, as to its use and diversion, as applied to it in its ancient channel (Gould, Waters, § 225; Wood, Nuisances, § 399; *Stevens Point Boom Co. v. Reilly,* 44 Wis. 295–298); while mere surface water does not become a watercourse by being gathered into a ditch and led away (Wood, Nuisances, § 401; *Fryer v. Warne,* 29 Wis. 511; *Stanchfield v. Newton,* 142 Mass. 110). Since it is considered that it was mere surface and percolating water which was gathered into this ditch, it follows that it was still subject to be used and disposed of, for his own purposes, by the proprietor of land upon which it came. Wood, Nuisances, § 402 *et seq.; Curtiss v. Ayrault,* 47 N. Y. 73–82. The proposed new ditch upon the land of the defendant *Stickney,* above the plaintiff's land, was not a violation of any right of the plaintiff. *Stickney* had the right to dispose of such surface and percolating water as came to his land for his own purposes, and in such manner as best suited his inter-

ests or choice. The other defendants might well stand on his right, for they are in privity with him. So, the first ground of this claim is untenable.

It remains to be considered in what measure, if at all, the plaintiff's rights in this ditch, and to the use of its water, have been strengthened by the Goodyear contract. It cannot, of course, be claimed that the defendants are under any greater or different obligation to the plaintiff in respect of the maintenance and repair of the ditch than rested upon the Goodyears at the time of the sale to *Hoffman;* for the defendants, at most, have agreed only to save the Goodyears harmless against their obligations to the plaintiff at that time. At that time the contract still rested in parol. The defendants could not be made liable on a contract subsequently made. The contract is noticeable for what it omits. It does not specify that the Goodyears shall maintain the ditch, nor that they shall keep it in repair. They promise nothing, except that the plaintiff may get water from the ditch. Nor does the contract specify for how long the plaintiff shall be permitted to take the water. It might be a question of some difficulty to determine how far it was intended to bind the Goodyears. Yet it may be fairly assumed that the parties contemplated some benefit to the plaintiff from it. But it is not necessary to inquire what the precise measure of the obligation was which the Goodyears intended to assume, for it seems clear, in any aspect, that the contract was void under the statute of frauds, and not binding at all on the Goodyears. If it was intended to give the plaintiff some interest in, and control over, the ditch, it was invalid for that purpose because not made in writing. R. S. 1878, sec. 2302. The ditch is land within the meaning of the statute. R. S. 1878, sec. 4971; 3 Kent, Comm. 401; 1 Washb. Real Prop. 4. If the contract could not, according to its terms and the intention of the parties, be completely performed within one year from its making, it is

void because not in writing. R. S. 1878, sec. 2307; *White v. Hanchett*, 21 Wis. 415; *Jilson v. Gilbert*, 26 Wis. 637; *Doyle v. Dixon*, 97 Mass. 208. Whichever horn of this dilemma the plaintiff may choose to take, the result is the same to him. If the contract was to be completely performed within one year and so was valid, then it had been fully performed and discharged before *Hoffman* bought the ditch. If it was not intended that it should be completely performed within a year, but that its performance should be continuous through a series of years, then it was void, and not binding upon Goodyear, at the time when *Hoffman* bought. In neither case is the plaintiff's case made stronger by reason of the contract.

On the whole case, it is considered that the evidence fails to show an ancient watercourse across the plaintiff's land; that the ditch diverted no ancient watercourse, but intercepted and collected only surface and percolating water; that this was not a wrong of which plaintiff can complain; that the ditch did not become a legal watercourse; that the water conveyed by the ditch did not cease, in legal contemplation, to be surface water, subject to be used or disposed of by the owners of the land upon which it came; and that the defendants are under no contract obligation to maintain the ditch or keep it in repair for the plaintiff's benefit.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with direction to dismiss the complaint. The printed case is needlessly large. The cost of printing the case, to be taxed, is limited to 500 pages.

MARSHALL, J. I respectfully but earnestly dissent from the decision reached in this case and the reasons given to justify such decision. It occurs to me that argument as to the law respecting what constitutes a watercourse would show a want of comprehension of the force of the principles to which I shall refer. That will account for the entire ab-

Case vs. Hoffman and others.

sence from this opinion of any attempt at such argument.
The law for this case was definitely settled on the first ap-
peal. *Case v. Hoffman,* 84 Wis. 438. The decision was
rendered by a divided court. Justices ORTON and LYON and
the present Chief Justice concurred in that decision, and Jus-
tices WINSLOW and PINNEY dissented. By such decision the
determination of the lower court as to the sufficiency of the
complaint was overruled. The questions involved were:
What are the requisites of a watercourse? and Does the com-
plaint allege the existence of such requisites? The initial
question here is, Did the trial court find the facts which this
court held sufficient to constitute a watercourse? and if an-
swered in the affirmative, to be followed by the question,
Can the findings in that regard be disturbed on the evidence,
under the principle of law governing that subject? I have
no apologies to make for the former decision. I am not
called upon to justify, and have no right to question, it in
any particular, yet have no hesitation in saying that, in my
opinion, its conclusions are unmistakable, the reasoning upon
which they are based is unanswerable; it is well supported
by prior elementary and judicial authority, and has been
referred to and applied by eminent courts since it was ren-
dered in well-considered cases, as the Chief Justice shows in
his dissenting opinion. Whether right or wrong, all must
concur that it is the law of this case and that effect should
be given to it the same, precisely, as if there were neither
then nor now any division of opinion existing in respect to
its stating the law correctly. No material part of it should
be eliminated by hypercritical reasoning or rejected as " in-
consequential and absurd," tested by a present view of the
law. My brethren of the majority recognize the general
principle, yet, as it seems to me, by a refinement of reason-
ing, they fence in the former decision so as to clearly narrow
its obvious scope and meaning, and practically overrule it.
In my judgment it should be closely followed in letter and

spirit, and the rule in that regard covers all the grounds upon which the decision was based.

What was said at the close of the preceding paragraph is one of the grounds of my dissent. Some reference to precedents respecting the binding force of a former adjudication seems to be necessary at this point, not because there is any difference of opinion as to the general principle, but to show that it should be broadly and firmly applied.

It is bad enough to have the law changed when once settled by the courts. The law as once settled for a particular case cannot be so changed without violating a principle firmly established and absolutely necessary to the due administration of justice. In *Noonan v. Orton*, 4 Wis. 335, a demurrer to a bill filed turned on whether a lease was a demise of water merely, or of water and an interest in land. The case was again before the court on appeal from the judgment rendered on a trial of the issue formed by the complaint and answer. 27 Wis. 300. On such second appeal an effort was made to reopen the question of the proper construction of the lease, and on that point Mr. Justice COLE, speaking for the court, said: "The counsel for the defendant has criticised somewhat the soundness of that decision, and has attempted to restrict the extent of the propositions of law there decided. But it seems to me impossible to say that the above points were not fairly raised by the issue of law presented by the demurrer to the bill and passed upon by the court. So that, whether rightly or erroneously decided, those questions are no longer open for discussion, but are clearly *res adjudicatæ*." In *Lathrop v. Knapp*, 27 Wis. 214, certain questions of law raised on a general demurrer to the complaint were decided. The case came here again on appeal from the judgment. 37 Wis. 312. In the meantime Mr. RYAN became chief justice in place of DIXON, C. J., and Mr. Justice LYON became a member of the court in place of Justice PAINE. On the first appeal Mr. Justice

Paine declined to sit; Dixon, C. J., was in favor of affirm-ance and Justice Cole of reversal. On such division of the court the order of the lower court was affirmed as a neces-sary result. On the second appeal Justice Lyon, for per-sonal reasons, declined to sit, and a strong appeal was made to the court to review the question decided on the first ap-peal, because of the fact that the affirmance of the order of the lower court was on a division *ex necessitate*. A concurrence of Ryan, C. J., with Mr. Justice Cole would have overruled the decision on the former appeal. On the effect of the former judgment under these circumstances, the chief jus-tice, in delivering the opinion of the court, said: "I cannot entertain a doubt that all the questions settled by the judg-ment of this court on the demurrer are *res adjudicatæ* in this cause, in this court and in all courts, and with the same effect as if that judgment had been pronounced by a unani-mous court. Less effect could be given to such a judgment only by going behind the judgment; and that would tend to subvert all principles on which the conclusiveness of judgments rests. I do not see why, if courts could avoid the conclusiveness of a judgment because it proceeds on a dis-agreement of the judges, courts mights not as well avoid the conclusiveness of a judgment because it proceeds on an opinion founded in mistaken conclusions of fact or law. In both cases, alike, the judgment is impeached *for not resting on sound judicial conclusions*. The answer to all such at-tacks upon the sanctity of judgments is found in the safe and settled rule that judgments are *ex proprio vigore* conclu-sive. *Judicia sunt tanquam juris dicta, et pro veritate ac-cipiuntur*. This has been expressly held of judgments *ex necessitate* of a divided court." In *Fire Dept. of Oshkosh v. Tuttle*, 50 Wis. 552, on appeal from a judgment, Mr. Justice Lyon, speaking of questions decided on a former appeal from an order sustaining a demurrer to the complaint, said: "The question is *res adjudicata*. . . . Whether the de-

cision is sound or unsound, for the purposes of this case the question is irrevocably settled." See, also, *Ellis v. N. P. R. Co.* 80 Wis. 459, on the same subject.

From what has preceded it is obvious that the judgment of this court, heretofore rendered, settled forever every question legitimately included within and covered by it, for now, at least, the principle of estoppel by former judgment must prevail and govern absolutely. In the words of the learned chief justice in *Lathrop v. Knapp*, 37 Wis. 312: "Judgments are, as it were, the words of the law and are received as truth." Such words are infallible between the parties, and for the case and court, and for all courts.

The foregoing covers the question of the force of the rule of former adjudication. A few words now as to the scope of the principle. Respecting the existence of such general principle there can by no disagreement. It is a hedging in of the principle by my brethren, within limits not justified by well-settled law, as I view it, to which I dissent. It will not do to merely say that *the only question settled on the former appeal is that the complaint states a cause of action, and that the question here is whether the facts found by the court prove the existence of a watercourse.* True, whether the complaint stated a cause of action was formerly the issue, but that included all questions necessarily within that issue and determined in order to reach the decision which was rendered; not merely the questions which we may say were necessarily within the issue, but all questions which the court, by its construction of the pleading, *considered within the issue.* Wells, Res Adjudicata, § 217. " *Every proposition assumed or decided by the court, leading up to the final conclusion, and upon which such conclusion was based, was as effectually passed upon as the ultimate question which was finally solved.*" *Trustees of School Dist. v. Stocker*, 42 N. J. Law, 115. That is to say, none of the grounds upon which the decision rests, which were assumed by the court to be

within the issues, can properly be said to be *obiter dictum* because some of them were really unnecessarily so assumed. The judgment is authority upon all the points which the record shows the court considered and decided in rendering it. *Quackenbush v. W. & M. R. Co.* 71 Wis. 472. It applies to all questions upon which the court was required to form an opinion and pronounce judgment (*Cramer v. Stone*, 38 Wis. 259), and all questions raised and fully discussed on the appeal (*Giffert v. West*, 37 Wis. 115). The proper rule cannot be found better stated than by ANDREWS, J., in *Pray v. Hegeman*, 98 N. Y. 351, in effect thus: 'The estoppel of a former adjudication extends to and renders conclusive every material matter within the issues, which was expressly litigated and determined, and also to all matters which, though not expressly litigated and determined, are comprehended and involved in the thing expressly stated and decided; whatever is necessarily implied is, for the purposes of the doctrine of *res adjudicata*, as effectually decided as matters expressly stated.'

The doctrine of estoppel by former adjudication I have discussed at some length. From my standpoint it is justified, because, in my judgment, the opinion of my brethren of the majority clearly violates such doctrine, and because it is considered well settled in our jurisprudence that, though a decision be wrong and great hardship may flow therefrom, it is far better that it stand than that such uncertainty exist as would necessarily grow out of a system whereby a matter adjudged one way one day may be adjudged another way the next, between the same parties, on the same facts, and in the same case and court. Hence, a judicial decision once made on a question of law, unless manifestly wrong and challenged for review before important interests have grown up under it, is considered not open for discussion, even where it subsequently arises between other parties; and when between the same parties, on the same facts, it is for-

ever at rest. This important principle should be particularly applied to the end that the sanctity of judicial decisions may be firmly established. *Stare decisis, et non quieta movere,* should not be departed from as controlling judicial policy, unless necessary, in any case, and on the same case, between the same parties, never. In the former it stands as a precedent of such persuasive character as not to give way except to overpowering necessity; in the latter, as evidence or as an estoppel, it is conclusive and cannot be departed from at all.

It follows from what has preceded that the grounds upon which the court rested the decision on the former appeal are essentially a part of such decision. They are included in it and are as effectually the law of this case as the judgment they support. Therefore, we must examine the complaint and the opinion of the court and thereby determine what points were made to sustain the defendants' contention that it did not state a cause of action and the grounds upon which such points were overruled by the court.

If anything was decided on the former appeal, it was distinctly held that if water issue from living springs and flow constantly in a well-defined channel, having a bed and banks for a considerable distance, and then disappear under the surface, and at a considerable distance from such point of disappearance reappear and flow on in a well-defined channel, with bed and banks, it constitutes a watercourse continuous from the point where the water first comes to the surface at such springs; and the law respecting the rights of riparian owners to have such water flowing in such watercourse come to and pass over their lands without interference by any person above them on the stream, applies; that, notwithstanding the disappearance of the water at a point above a lower riparian owner and its flowing under the surface for a considerable distance, or even a greater part of the distance between its source and such riparian owner, so that in

most places between such source and the lands of such owner the stream is not visible by any surface indications, if the water which comes to the surface and forms a visible stream or watercourse at the lower point can be identified as the same water that came to the surface at the spring above, and it be established that the flow is continuous from such point above, whether on or beneath the surface, the fact of such disappearance and flow beneath the surface does not take from the character of the watercourse as being continuous from the source at the springs. Numerous decisions of courts of the highest respectability are cited in support of this doctrine, in the opinion written by Mr. Justice Orton, and the doctrine was applied to the case made by the complaint (quoting from the complaint), in effect, with conclusions thus:

1. Above plaintiff's land there were always living springs discharging their water in a well-defined stream into a lake; therefore, we have unquestionably a watercourse. What becomes of it after such disappearance?

2. From the lake the water flows upon and beneath the surface of the lands lying southeast of the lake to and across the lands of plaintiff, and then easterly into Beaver Creek, the distance being but a few miles.

3. Notwithstanding the complaint alleges that the water, in passing from Big Lake to plaintiff's land, flows, in places, wholly under the surface, it has none of the characteristics of mere surface water, but all the characteristics, within the principles of law discussed, of a running stream.

4. The natural flow or stream from the lake was well defined and established, and in places, one of which was upon plaintiff's land, it had made a plainly marked channel, showing the natural flow of the water.

5. Thereafter, discussing the question of whether it was necessary that there should be a visible flow of water upon the surface in order to preserve its character as a water-

course, Mr. Justice Orton said substantially: 'If the stream spreads out over wide reaches of marsh and swamp land and percolates the soil in many and most places between Big Lake and Beaver Creek, or in all places where the soil was not suitable for cutting a well-defined channel, such spreading of the stream through marshes and swamps on or below the surface does not militate against its being a watercourse in every essential particular, if it can be traced or identified as the same stream, and its identity is alleged in the complaint in this case, and it is a fact to be proved and established on the trial.'

From the foregoing it is obvious that the court understood, as the fact was, that the complaint charged as facts, relied upon to show that the water which plaintiff contended constituted a running stream and watercourse, coming naturally to and passing over his land, that such water came first from living springs above Big Lake, then flowed continuously in a well-defined channel for some distance to and into such lake; that it flowed out of the lake in a well-defined channel for some distance to the southeast and then disappeared in the swamp; that such point of disappearance was a considerable distance above plaintiff's land, and that, from such point to such land, it flowed ordinarily, in most places, under the surface and through the marsh and swamp in such a way as not to be visible on the surface as a running stream; that further down the water came to the surface and was gathered naturally into a well-defined stream and flowed on into Beaver Creek; and that the question of whether the complaint stated a cause of action turned on whether the fact that the water above plaintiff's land spread out over the marsh and swamp and percolated through the soil and under the swamp and through the peat and moss, destroyed its character as a watercourse, commencing at the spring above Big Lake and reaching to Beaver Creek below such lands. That was the question discussed and decided,

and how?   Obviously, we think as stated, that water which
flows from springs in a well-defined channel into a lake,
and then in a well-defined channel to a point where it
spreads out over a swamp or marsh and disappears under
the surface, and flows on by percolating through the swamp
or marsh under the surface, or through the moss and peat,
in most or all places for several miles, and then reappears
and forms a visible, well-defined stream, is a watercourse
throughout its whole length from its source at the springs;
that the existence of the watercourse up to the point of dis-
appearance being established, the test of whether the water
that reappears and is collected into the running stream
below is a continuation of such watercourse is whether such
water, so collected, can be identfied as the same water that
constituted the watercourse above, down to the point of such
disappearance; that the source and running stream there-
from being once established, the water may spread out over
the surface or disappear under the surface, and, lower down,
reappear as a visible, running stream, and spread out and
disappear and reappear again and assume its visible charac-
ter as a running stream, without militating against its char-
acter as a watercourse from the source at the springs, where
it first issues from the earth, if the water at the lower point
can be identified as having come by a continuous flow from
such springs.   That being the question presented by the ap-
peal and decided by the court, such decision and the grounds
which the court assumed to be necessary to support it are
*res adjudicatæ* and absolutely binding in this case, as hereto-
fore shown in the discussion of that subject. "Admit," says
Mr. Justice ORTON, "that the complaint shows that the
stream spreads over and through wide reaches of swamp
and marsh land, and percolates the soil in many and most
places between Big Lake and Beaver Creek, or in all places
except those mentioned, where the ground was suitable for
cutting a well-defined channel as above described, such

spreading of the stream . . . on or below the surface
does not militate against its being a watercourse in every
essential particular, if it can be traced and identified as the
same stream." So the court, looking at the complaint most
unfavorably for plaintiff, still held that it stated a good
cause of action; therefore the decision is *res adjudicata* of
the questions presented by such unfavorable construction,
whether we say now it was or was not a correct construction.

By the foregoing we have clearly shown:

First, that whatever was decided on the former appeal,
and was deemed necessary to the decision of the court when
made, including the grounds upon which the court reached
such decision, must rule the case now; that our duty ends,
so far as the law of this case is concerned, when we deter-
mine what was decided.

Second, that it was there held that if the facts were that
water issued from living springs and flowed through a well-
defined channel to Big Lake and out of such lake to a point
where it spread out over the marsh and disappeared beneath
the surface and percolated through the moss and peat form-
ing the surface of such marsh or swamp, and at a consid-
erable distance below such point of disappearance water
appeared, having all the characteristics of a visible, running
stream, and the water at such lower point can be identified
as the same water that disappeared above, then that above
and that below belong to one and the same watercourse.

It remains to be seen whether the facts alleged in the
complaint, held to constitute a cause of action, were found
to exist by the trial court, and, if so, whether such findings
can be disturbed as against the clear preponderance of the
evidence. If these questions are resolved in plaintiff's favor,
he is entitled to such relief as will protect his rights as a
riparian proprietor, as against the defendants, who insist on
diverting the water from the alleged watercourse, so as to
prevent its reaching his land.

We now turn to the findings of fact filed by the learned circuit judge, and read in regard to the alleged watercourse, as follows: "The source and flow of water . . . in a state of nature was . . . as follows: . . . Beaver Creek . . . had its source or origin in certain living springs located in section 8 in said town. These springs discharged their waters at all seasons of the year by definite and clearly marked channels into a common stream, several feet in width, varying in depth, but always with a fixed channel, with bed and banks and steadily flowing stream, the water running in a southeasterly direction a distance of some sixty or more rods into the lake known as Big Lake. . . . At the south end of Big Lake the waters were discharged by a channel or outlet to the southeast, and thence, *though not by a continuous surface channel*, but with a definite and clearly marked flow, in a southeasterly direction through portions of sections 9, 16, and 15, the north half and southeast quarter of section 22, the south half of 23, and the southwest quarter and the southeast quarter of section 24, and thence easterly into Beaver Creek. This stream from its source to where it flowed into Beaver Creek was called the West Branch of Beaver Creek, and though under natural conditions the water spread out in places and flowed over and through the peat and moss between sections 8 and 24, it, in many places along its course, made for itself channels with bed and banks, some of which channels still exist in sections 15, 19, 22, and 23." See finding III. "At the southeast of Big Lake the waters thereof flowed out for some distance through a well-defined outlet of said lake, with bed and banks, and from thence through a portion of section 9 and sections 16, 15, 22, 23, and 24 to Beaver Creek. . . . From Big Lake down to the continuous channel of the West Branch of Beaver Creek in sections 23 and 24 the water, under natural conditions, did not flow along and in a continuous channel throughout the entire distance, but through the larger

part of the distance spread out over the surface and beneath the surface, and ran through the moss and peat in a general southeasterly direction, as above indicated. The volume and current thereof were sufficient, however, to plainly mark its direction and flow, and in places, some of which were on the lands of the plaintiff, to make for itself channels, as above stated, establishing conclusively that the waters flowing out of Big Lake naturally came to and flowed over plaintiff's land in section 22, and from thence to the east, where it was again collected in a natural stream with continuous and permanent bed and banks. Had the soil through which it ran been free from moss and peat, which for the most part covered it, the water would have made along its entire course a continuous and well-defined channel with bed and banks." Finding IV.

It would seem that argument is unnecessary to demonstrate that the facts thus found are precisely those which this court said in the former decision are the essential elements of a watercourse, and that to incumber this opinion with argument in that regard would be a mere work of supererogation. The learned circuit judge obviously followed the decision with scrupulous care. The language of the complaint, and of the decision of this court as to its sufficiency, are copied substantially into the findings. In the light of this, having from the evidence traced the water from its source to where it flowed out of Big Lake to the southeast and spread over and disappeared in the marsh, and found from the evidence that it flowed on from such point of disappearance in most or all places through the moss and peat and under the surface to where it assumed the shape of a visible stream below plaintiff's land, and that the conditions shown by the evidence demonstrated conclusively that the water which formed a visible, flowing stream below plaintiff's land was the same water that flowed out of Big Lake to the southeast, the trial court could not come to any other

legal conclusion than that the watercourse was continuous from its source to and across plaintiff's land.

It only remains to be seen whether the findings of fact are against the clear preponderance of the evidence, for if not, certainly, by a rule as firmly established as any in our jurisprudence, they cannot be disturbed, and plaintiff is entitled to substantial relief, as it is conceded that if the facts establish an ancient watercourse the canal has taken its place.

A brief review of the evidence will amply sustain respondent's claim that the findings cannot be disturbed under the rule above referred to, and demonstrate clearly that no other conclusion could reasonably have been reached.  There is evidence in abundance that before the building of the canal, in times of high water, there was a perceptible surface flow through substantially the whole distance from the lake to plaintiff's land, and that when the canal was dug it was located with reference to the inflow of water from the lake, as indicated by water flowing upon the surface in many places.  Professor Conover, one of the surveyors, testified to the existence of depressions indicating the flow of water all the way to plaintiff's land; that he followed such depressions down from the lake and examined the indications closely; that the water which flowed out of the lake to the southeast and then spread out over the marsh flowed southeast to, and the greater part of it passed over, plaintiff's land; and that the canal entirely intercepted the natural flow, so plaintiff could not receive any of the water except by way of such canal.  In respect to the depressions showing the natural channel he said that some of them were as long as 300 feet or perhaps longer, with sharp-cut edges along which grass lay, just as though a current had swept it there; that near the north line of *Mr. Case's* land there was a channel 300 or 400 feet long.  Samuel F. Crabbe, another engineer, who spent a large amount of time upon the land, testified,

in effect, that there were plain channel markings all the way to plaintiff's land; that he found channels on such land leading toward Beaver Creek, some of them very marked, all leading in the same general direction; that there was one very marked channel reaching nearly across a forty; that this channel had very definite banks, and that there was considerable water in it; that he followed the channels along to Beaver Creek; that the indications were plain that the water which flowed out of Big Lake to the southeast flowed through the swamp and marsh, where indicated by channel markings, into Beaver Creek to the south and east of plaintiff's land.

There is a large amount of other evidence in the record of the same general character, and evidence from several persons who were familiar with the country before the construction of the canal, to the effect that there was then an unmistakable flow of water from the lake to plaintiff's land. Mr. Brooks testified that he visited the country as early as 1873; that the inlet at the lake was then two or three rods wide; that the water was running out of the lake to the southeast in a considerable body, the widest channel being as wide as twelve feet; that in 1875 he was on the ground again and followed the open channel half a mile and traced it substantially to plaintiff's land; that he could then follow the channel by walking in the water; and that in 1876 he again traced the water over the same course. Mr. G. W. Hancock testified that in 1882 he traced the watercourse from the lake down to and across plaintiff's land. Mr. Rhodes, who helped dig the canal, testified that when they were digging the main water supply came from ahead, from toward the lake, and that they had difficulty at times, by reason of the peat at the bottom of the ditch rising up; that when they got near to the lake the flow of water was very strong.

Evidence of like character to that specially mentioned, altogether making a very strong case, appears in the record,

fully warranting the trial court in finding that it established
conclusively that before the canal was dug the water flow-
ing out of Big Lake naturally came to and flowed over
plaintiff's land in section 22, and to the east of it, where it
was collected into a natural running stream, with continuous
and permanent bed and banks, and that the building of the
canal gathered the water into, and caused it to go by way
of, such canal, and interfered with and so changed the nat-
ural flow that, if the flow be now interfered with by way of
such canal, to the extent of such interference it will take
away the water that was formerly wont to flow to and over
plaintiff's land.

As this case, except as to the nature of relief to which
plaintiff is entitled, turns on the questions above discussed,
it is not deemed advisable in this opinion to go further.
Enough has been said to show clearly our views on the main
question.    The law of the case was settled on the former ap-
peal.    Whether right or wrong, we cannot change it either
directly, by now holding to a different rule, or in effect, by
fencing in the principles there laid down within narrow
limits, not warranted by the plain meaning of the court or
the well-settled rules governing the subject.    The trial court
found in favor of plaintiff as to facts alleged in the com-
plaint, which this court said made a case entitling plaintiff
to substantial relief as a riparian proprietor.    The evidence
abundantly supports such finding; hence, though the relief
granted may be excessive, plaintiff is at least entitled to a
judgment that will preserve to him, so far as practicable, all
the advantages of the flow of water from Big Lake to his
land, as the same was wont to flow before the construction
of the canal.

CASSODAY, C. J.    I concur in the dissenting opinion of Mr.
Justice MARSHALL in this case.    I concurred in the decision
of this court in this action on the former appeal, and the

opinion then written in support of the same by the late Chief Justice ORTON, in behalf of the majority of the court as then constituted, because I believed that opinion to be substantially correct. I perceive no reason now for changing the conviction then reached. On the contrary, that conviction has since been confirmed by the re-examination of the principles involved, and by the express approval of that decision, and the principles upon which it was based, by courts of at least two other jurisdictions. *Mitchell v. Bain*, 142 Ind. 604, 614; *Rigney v. Tacoma L. & W. Co.* 9 Wash. 576, 580.

There is no claim or pretense that the water in question was mere surface water. All agree that it had its source in living springs, and that water flowed therefrom. The dispute has been as to the direction in which it flowed, and as to whether such flow was in a defined channel. In the first of the cases cited, it is expressly held that "water which has a definite source in a spring, and takes a definite course, is a watercourse, which cannot be lawfully diverted from its natural channel so as to injure another's land, although at a certain point it spreads over marshy ground, without a defined channel, where it again flows in such a channel." In the second case thus cited, it was held that "the fact that a stream widens into a marsh or swamp will not deprive it of its character as a natural watercourse, if it continues its current through the swamp, and finally emerges therefrom in a well-defined channel." Numerous other authorities might be cited to the same effect. *Gillett v. Johnson*, 30 Conn. 180; *Macomber v. Godfrey*, 108 Mass. 219.

The principle upon which such decisions rest has become elementary. A well-recognized author on the subject states the same principle of law thus: "If a well-defined, natural stream empties into a swamp or lake where all definite channel is lost, and emerges again into a well-defined channel below, it is a question of fact, dependent upon the extent of the

swamp or lake, whether it is the same stream, and, if it is, the owners of the land upon the lower stream have riparian rights, and an owner of land upon the stream above the swamp or lake is not entitled to divert the water therefrom to their injury." Gould, Waters (2d ed.), § 263. "A stream does not cease to be a watercourse and become mere surface water, because at a certain point it spreads over a level meadow several rods in width, and flows for a distance without defined banks before flowing again into a definite channel." Id. § 264. To the same effect is 28 Am. & Eng. Ency. of Law, 945, 946. These text writers cite numerous adjudications in support of such statements.

I have no purpose here of rearguing the questions so well covered by my Brother MARSHALL. In my judgment, the findings of the trial court and the evidence in support of them, as well as the allegations of the complaint, bring the case squarely within the elementary rule of law stated. To my mind, the former adjudication in this same case is *res adjudicata*, and absolutely binding upon the court, regardless of its merits. To say that this adjudication is not repugnant to the decision upon the former appeal is, I respectfully submit, to disregard the maxim that, where two things are each equal to the same thing, they are necessarily equal to each other. This statement is sufficient to disclose my position in the case, and I have no purpose to say more.

The respondent moved for a rehearing, and on December 10, 1897, also moved to set aside the judgment.

In support of the latter motion there was a brief by *La Follette, Harper, Roe & Zimmerman*, attorneys, and *James G. Flanders*, of counsel, and oral argument by *Mr. Flanders*. They argued, among other things, that Justice NEWMAN was disqualified to sit on the hearing of the appeal. *Orton v. Noonan*, 31 Wis. 297; *State ex rel. Ambler v. Hocker*, 25 L. R. A. 114, 119; *Newcome v. Light*, 58 Tex. 141; *Van Arsdale*

*v. King,* 152 N. Y. 69; *Duryea v. Traphagen,* 84 id. 652; *Pistor v. Hatfield,* 46 id. 249; *Real v. People,* 42 id. 270, 276. If Justice NEWMAN was disqualified, the judgment hereinbefore rendered is void, and entirely incapable of being made good by any omission or waiver, or even by express consent of both parties. *Oakley v. Aspinwall,* 3 N. Y. 547; *Pistor v. Hatfield,* 46 id. 249; *Duryea v. Traphagen,* 84 id. 652; *Richardson v. Welcome,* 6 Cush. 331; *Hall v. Thayer,* 105 Mass. 224; *Sigourney v. Sibley,* 21 Pick. 101; *Moses v. Julian,* 45 N. H. 52; *S. C.* 84 Am. Dec. 114; *Chase v. Weston,* 75 Iowa, 159.

*A. R. Bushnell* and *F. W. Hall,* in opposition.

The following opinions were filed February 8, 1898:

WINSLOW, J.   A motion is now made in this case to vacate the judgment rendered in this court upon the last appeal upon the ground that the late Mr. Justice NEWMAN was disqualified to participate in the decision, under sec. 2580, R. S. 1878, which reads as follows: "No judge of an appellate court . . . shall decide or take part in the decision of any cause or matter which shall have been determined by him, while sitting as a judge of any other court, unless there shall not be a quorum without him." This provision of law has been upon the statute book since the enactment of the Revised Statutes of 1849. Sec. 21, ch. 87, R. S. 1849. It has been uniformly acted upon since that time without question, nor is its validity questioned upon the present motion. It is manifestly founded upon the idea that in an appellate court the parties are entitled to have a hearing before a bench, none of whose members has previously passed upon the matter in issue, or upon any material part thereof. Whether it be a wise provision or not, it is certainly a provision intended to operate in the interest of fairness and justice, and we see no ground upon which its validity can be impeached. Similar provisions exist in a considerable number of states, and the

Case vs. Hoffman and others.

same principle was adopted when the United States circuit courts of appeals were organized. 26 Stat. at Large (51st Cong. Sess. II), ch. 517, sec. 3.

The act in question being valid, the fundamental question upon this motion is, Did Justice NEWMAN, while upon the circuit bench, determine this cause, or any essential part thereof? The action was brought by a lower proprietor to restrain certain upper proprietors from diverting the flow of water in a certain ditch, on the grounds (1) that the ditch was, in fact, a natural watercourse, or had taken the place of an ancient watercourse, and (2) that the plaintiff had acquired the right to have the water flow through the ditch by the terms of a parol contract with the defendants' grantors, which had been fully executed. While upon the circuit bench, Judge NEWMAN sustained a general demurrer to this complaint. Upon appeal to this court from that order, the complaint was held good by a divided court, upon the ground that the allegations of the complaint, fairly construed, charged the existence of a natural watercourse; but the question whether any rights had been acquired under the alleged contract was left undecided. *Case v. Hoffman*, 84 Wis. 438. The case then went back to the circuit court, and was tried before Hon. W. F. BAILEY, circuit judge, who made findings to the effect that there was an ancient natural watercourse, which now flows in the ditch, and is substantially the same stream, and also that the oral contract was entered into and executed as alleged in the complaint, and entered judgment for the plaintiff restraining the defendants from diverting the flow of the water, and commanding them to maintain the ditch as it now exists. Upon appeal to this court from this judgment the late Mr. Justice NEWMAN sat with the court upon the hearing, and participated in the decision, and wrote the majority opinion reversing the judgment below.

It will, we think, be readily understood that the question now raised as to Justice NEWMAN's alleged disqualification

to participate in the determination of this case is not only a serious one, but is also an unwelcome and delicate one to his associates. The unwelcome and delicate character of the question has been augmented, rather than diminished, by the recent sudden death of our brother, which is so deeply deplored by bench and bar alike, but most of all by those who have labored with him for the past four years, and who had become bound to him by the strongest ties of admiration for his high judicial and legal abilities, and affection for that simple, rugged, and true heart, which, all too soon, has ceased to beat, forever. In all soberness and truth it may be properly said here that no more conscientious and high-minded judge ever sat upon an appellate bench than our deceased brother. His character was transparently pure and honest. But, unwelcome as the question is, it must be met, and it must be met squarely, and with a single desire to ascertain and administer the law as it is. It is fair to say that the question was not raised, or even suggested, by counsel upon the argument of the cause; and, while this failure constituted no waiver of the point, it is a fact which should be known as explanatory in some degree of subsequent events, and of Justice NEWMAN's action in the case.

The profession will at once appreciate that this objection (at least when not raised at the bar) is peculiarly an objection personal in its nature, and one which has generally been considered and decided for himself by the justice whom it is supposed to affect, and not by his colleagues. The argument having passed with no mention of any objection, it may well be that it did not appeal with any substantial force to the mind of Justice NEWMAN. However this may be, the case came to him to write in its natural order, in accordance with the established custom of the court; and with his accustomed desire to do his whole duty as a member of the court he took it, and labored upon it long and conscientiously. Upon what line of reasoning he considered and de-

cided in his own mind the question now raised, we can never know, but certain we are that he concluded that he was not disqualified, and that it was his duty to participate in the decision. Such conclusion may, perhaps, be inferred from a perusal of the opinion, because he took great pains to draw the distinction between the question presented by the demurrer, namely, whether the allegation of the complaint charged the existence of a watercourse, and the question raised upon appeal from the judgment, namely, whether the evidence proved the existence of a watercourse as alleged. Speaking for myself alone, I must say that the distinction so made seems to me well and conclusively drawn, and, were there no other element in the case, I should be unable to see where the reasoning failed.

There is, however, another element in the case, which he seems not to have considered, or, if he did consider it, seems not to have appreciated its true bearing. The plaintiff claimed a right to the uninterrupted flow of water, not only upon the ground that there was a natural watercourse, but upon the ground of *a fully executed parol agreement* for such flow with the defendants' grantors. When Judge NEWMAN, upon the circuit bench, decided that the complaint stated no cause of action, he necessarily decided not only that no watercourse was alleged, but that the alleged agreement was worthless. When the case came here after trial, the trial court had found upon sufficient evidence that the alleged parol agreement was made as alleged, and granted judgment for the plaintiff after finding this fact as well as the fact that there was a natural watercourse. It was necessary, therefore, for this court to decide whether that agreement was of any validity, and that question was considered and decided, as appears by the opinion. It seems clear to us all that this was precisely the same question which arose upon the demurrer. Upon demurrer the question upon this branch was whether the agreement *alleged* was binding; upon final hear-

ing the question was whether the agreement *proved* (which was the same as the agreement alleged) was binding. There seems no escape from this reasoning, and consequently no escape from the conclusion that when Judge NEWMAN, upon the circuit bench, held that the alleged contract was worthless, he in fact determined, so far as that branch of the case is concerned, the same cause and matter which this court decided upon appeal from the judgment. It is of no avail to say that this question was not the main question in the case, or that it was dwarfed into insignificance by the other question. It was an integral part of the plaintiff's claim from first to last.  He claimed relief upon both grounds, and both grounds necessarily had to be disposed of before a judgment could be rendered.  Convinced, as we are, that for this reason Justice NEWMAN was legally disqualified to participate in the final determination of this case, it becomes necessary to consider what the effect of such participation is upon the judgment.

At common law it was recognized that a judge who was interested in the action or of kin to either party was disqualified from sitting in a cause. Notwithstanding this rule, however, his judgment in the cause was generally considered erroneous only, and not void, and the objection might be waived by the parties, either expressly or impliedly, by proceeding without objection to the trial knowing the facts.    Freeman, Judgments, §§ 144, 145; *Moses v. Julian*, 45 N. H. 52; *S. C.* 84 Am. Dec. 114, and cases cited.    Where, however, it is expressly declared by a constitutional or statutory provision that in a certain specified case a judge shall not sit, or shall not act, or shall take no part in the decision, the almost uniform current of authority is to the effect that any judgment rendered by such judge in such a case is *coram non judice* and void, and that express consent will not aid it. Freeman, Judgments, § 146, and cases cited; *Moses v. Julian*, 45 N. H. 52, 84 Am. Dec. 114 (see note, p. 130).    The same rule has

been applied when the disqualified judge has acted simply as one of a bench composed of several judges, even though the vote of the disqualified judge was not necessary to the decision; and with greater force would the reason of the rule apply when, as in this case, such judge gave the casting vote and decided the cause. *Oakley v. Aspinwall*, 3 N. Y. 547; *Converse v. McArthur*, 17 Barb. 410; *Reg. v. Justices of Hertfordshire*, 6 Q. B. 753; *Reg. v. Justices of Suffolk*, 18 Q. B. 416; *People v. Bork*, 96 N. Y. 188. The reason is stated in *Oakley v. Aspinwall, supra*, as follows: "Whatever a party may consent to do, the state cannot afford to yield up its judiciary to such attack and criticism as will inevitably follow upon their decisions made in disregard of the prohibitions of the law."

The rule seems to us to be founded upon reason and justice, and in fact to be the only safe rule to follow. It may seem that it was not followed in the case of *Walker v. Rogan*, 1 Wis. 597. In that case two out of three of the justices of this court were disqualified from acting because they had been of counsel in the case, and the parties stipulated that the remaining justice might hear the case and decide it, which decision should be entered as the decree of the court. The justice so named did hear and decide the case without assistance from the other justices, but upon rendition of judgment the other two justices sat *pro forma*, in order to make a quorum, without other participation of any kind in the case. The presence of at least one was necessary in order to make a quorum of the court which could pronounce judgment. Under these circumstances the stipulation was held binding, and the decree valid. The stern rule of necessity may, perhaps, justify this holding, because there seems no other way in which judgment could have been pronounced in the case until there was a change in the *personnel* of the bench, which might not be for years. The case is manifestly not the case before us now, and we certainly shall not ex-

tend its principle further than it went.  The case of *Oakley v. Aspinwall, supra,* was mentioned in the opinion in that ·case, and was said to have only a remote bearing upon the ·case, which we think is true.

Our conclusion is that the judgment must be vacated and the cause reargued.  This conclusion renders it unnecessary to consider the motion for rehearing, which has also been made by the respondent, as the cause will be reargued pursuant to the order entered upon this motion.  No costs will be granted either upon this motion or upon the motion for rehearing.

*By the Court.*— The judgment in this court is vacated, without costs, and the cause is ordered to be reargued.

CASSODAY, C. J.  I concur in the opinion filed by my Brother WINSLOW, setting aside the judgment entered in this court in this case, and all that is therein said in praise of our late Brother NEWMAN.  It logically follows from my opinion and the opinion of Mr. Justice MARSHALL, filed upon the hearing upon the merits, to the effect that the questions presented upon this appeal were substantially the same as determined by this court when the case was here upon the former appeal (84 Wis. 438), that the trial judge from whom that appeal was taken was, under the statutes, incompetent to take part in the decision of this court upon any branch of the case upon the last appeal.

MARSHALL, J. I concur in what is said by the Chief Justice.

The cause was reargued May 30, 1898.

For the appellants there was a brief by *Bushnell, Rogers & Hall,* and oral argument by *A. R. Bushnell* and *F. W. Hall.*

For the respondent there was a brief by *La Follette, Harper, Roe & Zimmerman,* attorneys, and *James G. Flanders,* of

counsel, and oral argument by *Mr. Flanders* and *Mr. G. E. Roe.*

The following opinions were filed June 23, 1898:

BARDEEN, J.  The facts upon which this litigation is founded are sufficiently stated in the opinions heretofore written in this case.  This case made its first appearance in this court in 1893, on an appeal from an order sustaining a demurrer to the complaint, and is reported in 84 Wis. 438.  The decision in the court below was made by the late Justice NEWMAN, who was then presiding at the circuit.  The order of the circuit court was reversed, and the cause remanded for further proceedings according to law.  Issue was joined by proper answers, testimony was taken, and findings and judgment were entered for plaintiff.  From this judgment, part of the defendants, feeling aggrieved, took this appeal.  The case was argued at the January term for 1897, and on September 28th of that year a decision was announced, by a divided court (Justice NEWMAN casting the deciding vote and writing the opinion), reversing the judgment of the court below.  A timely motion for a rehearing was made, and subsequently a motion to vacate the judgment so entered was submitted, the grounds of which sufficiently appear in the opinion of Mr. Justice WINSLOW, reported herewith.  The former judgment was vacated, and a reargument of the case ordered.  Additional briefs have been submitted, and the court has again been favored with a restatement of the claims of the respective parties from able counsel.  The case now comes for final determination upon the merits.  The plaintiff insists that a judgment of affirmance should be entered, because when the case was first heard the justices who were qualified to hear it were equally divided as to the merits of the case, and a judgment of affirmance under the rule should have been entered.  It is needless to say that such judgment was not entered.  The judgment that was entered

Case vs. Hoffman and others.

was void.   It stood, however, as the judgment of the court
until it was vacated, which was at a subsequent term; and
when so vacated this court had the power either to enter
judgment or to order a reargument.   It saw fit to do the
latter, and the case stands precisely as if no judgment had
in fact been entered,— to be determined according to the
light afforded the court by the new argument and the addi-
tional opportunity for reflection and consideration of the
matters involved.

At the outset one thing must be noted, and that is, so far
as applicable to the facts established on the trial, the decis-
ion first rendered upon the demurrer must be considered the
law of this case.   Whether good law or bad law, it is, and
must remain, the law by which this court must be guided
in all its future action in this case.   We shall not indulge in
any hair-splitting refinements, or in any effort to discover a
double interpretation to be given the former decision.   The
issue raised by the demurrer, giving the language of the
complaint its usual and ordinary interpretation, was whether
it described a watercourse to and over plaintiff's land.   The
facts were set out in detail, and the court considered them
in the light most favorable to the defendants' present con-
tention.   Upon such consideration it was then decided that
a watercourse was described, " although it showed that the
stream spread over wide reaches of marsh and swamp lands,
and percolated the soil in many and most places " between
its source and the place where it was again collected into a
well-defined stream.   Whether this determination is sup-
ported by authority, or whether it is "absurd or inconse-
quential," it is not our present purpose to inquire.   It is the
law of this case in plain and unmistakable language, and by
which we must be governed.

By reference to the findings of the trial court, we find
that he has followed with great fidelity the facts set out in
the complaint.   He finds that under natural conditions the

Case vs. Hoffman and others.

stream had its source in certain living springs, which discharge their waters, by definite and clearly marked channels, into Big Lake, and thence southeast, though not by a continuous surface channel, but with a definite and clearly marked flow, across other lands, and on and past plaintiff's lands, and into the West Branch of Beaver creek, and that in so doing the water spread out in places, and flowed over and through the moss and peat, and in many places made for itself bed, banks, and channels, some of which still exist, and was of such volume, when confined to a narrow channel like the canal in question, as to be capable of floating saw logs. His findings, so far as the source, direction, and volume of the stream are concerned, support the allegations of the complaint, and in some of the main particulars are even stronger than alleged therein. His findings in these respects are most earnestly challenged as not being supported by the evidence, and as being contrary to the real weight of the evidence. The earnestness of this contention has induced the court to examine with the most painstaking care and thoroughness the great mass of testimony preserved in the printed record, and to consult the many maps and exhibits in the case, which are claimed to possess helpful value. This examination leads to the disclosure that as to very many of the main facts the evidence is in irreconcilable conflict. A finding either way upon many of the disputed questions would find support in the evidence submitted. Such sharp conflicts, such positive contradictions, emphasize the necessity of the appellate court adopting the rule of not disturbing the findings of the trial court unless they are clearly against the preponderance of the evidence. The trial judge possesses many advantages of judging the credibility of witnesses. He becomes invested with many facts, circumstances, and details on the trial that cannot be transmitted to us; and when it is evident that he has reviewed the case with care, and that he has sought, as seems in this case to have

been done, to carefully and impartially distinguish the true from the false, his conclusions ought not lightly to be brushed aside. We find this to be a case where the situation of the trial judge must have been very helpful in arriving at a conclusion. A careful review of the evidence in detail convinces us that the findings of the court below ought not to be disturbed. It would serve no useful purpose to discuss the evidence at length. The opinion of Mr. Justice MARSHALL, filed at the former hearing, contains a sufficiently ample discussion of the evidence to support the conclusion we have reached.

The findings of the court in regard to the so-called Goodyear contract cannot be successfully impeached. There can be no doubt but that such a contract was made, that it was founded upon a valuable consideration, and that, so far as the plaintiff's use of the water from the canal is concerned, his rights were open, visible, and notorious. The findings seem to be strictly in accord with the great weight of the evidence, and with all the probabilities of the case. At the time the defendant *Hoffman* made his alleged purchase of the Goodyears' interest in the canal, he found this contract so far executed that the lateral waste-water ditch had been dug to the eastward, and plaintiff had tapped the main canal, and was in the enjoyment of a supply of water therefrom for the purpose of cranberry cultivation. The main canal had been dug across plaintiff's land without his consent, and the great volume of the water that came to his land naturally had been diverted to the south. In times of high water, large quantities of logs and débris escaped from the canal, and were deposited upon plaintiff's land. The plaintiff had made a claim for damages by reason thereof. He then agreed to permit the canal to remain where it had been constructed, and to forego the claim for damages; and the Goodyears built the waste-water ditch to the eastward, and from which the plaintiff was to receive so much water as was rea-

sonably necessary for his cranberry culture. As between the Goodyears and the plaintiff, it was a valid and binding contract, and, as we think, enforceable in equity. The location of the canal, and plaintiff's open enjoyment of the rights and privileges appurtenant thereto, was notice to *Hoffman* of the plaintiff's rights; and he was likewise chargeable with notice that the waters of a natural stream had been diverted from their usual course, and that it was impossible to restore the flow to its former course. With these conditions before him at the time of his purchase of the Goodyear interests, he took the same with the duties and obligations imposed upon his grantors, so far as they were disclosed by the situation. The attempt to alter the conditions, and to divert the flow of water entirely from plaintiff's land, was therefore wrongful and without right or authority. The plaintiff was entitled to the flow that came from Big Lake in a state of nature, and that right continued, notwithstanding the waters had been gathered into a channel and diverted from their original course. With a view of settling the controversy forever between the parties, the court found the plaintiff entitled to receive such an amount of water as would flow through an orifice six by ten inches in a sluice box in the canal, under a minimum head of two-tenths of a foot, which he finds is *less* than came to his lands in a state of nature. The evidence fully sustains this finding, if, indeed, it does not show that he was entitled to more water than was awarded him.

The court's findings establish the fact that the canal in question became a substitute for a natural watercourse, and that plaintiff was entitled to receive therefrom so much water as was reasonably necessary for cranberry cultivation on his land, under the limitations stated. He required the plaintiff to construct and maintain a waste gate on his land, as an outlet in times of flood. He enjoined upon the defendants the duty to restore the waters to the canal as originally

constructed, and to build and maintain a dam or bulkhead to hold back the water adjudged to the plaintiff.   To this extent the court would seem to have been justified by plain principles of equity.   But he goes further, and adjudges that the defendants, "their heirs, grantees or assigns, shall perpetually keep such canal in such condition of repair that the quantity of water hereinbefore found to be due the plaintiff may at all times be received by him in the manner stated," and, in case of their failure so to do, then plaintiff might repair the same at their expense.   The plaintiff's rights in the premises are based upon the fact that water came to his land naturally, and that the canal has become and is a natural watercourse.   In a state of nature, the water came to him *en masse* and uncontrolled.   Being delivered to him at this time by means of the canal, he is possessed of much greater advantages of control over it.   It thereby becomes much more available for his use than formerly, and this fact must have weight with a court of equity, when considering the mutual obligations of the parties.   Such being the foundation of the plaintiff's rights, and the fact being admitted that the manner in which the water is now delivered to plaintiff from above is an advantage to him over the old way, it is not exactly clear to us why defendants should be charged with the perpetual maintenance of this "natural watercourse" above the plaintiff's land.   Certainly the defendants ought to be required to restore the canal to the condition it was before their unlawful interference, and to keep up the canal on his lands as heretofore suggested. They should also be restrained from in any way interfering with or diverting the flow of water from Big Lake through this canal.   The fact that the waters from the Bear Bluff canal had been turned into it gave defendants no right to divert *all* the waters that came down the main channel.   The court saw fit to apportion the waters between the parties on

a basis deemed just and equitable, and that finding cannot
be disturbed.   The defendants seek to carry water to the
southward, in order to improve and cultivate their own
lands.   To do so, and not to interfere with the water rights
of plaintiff, it was necessary that the bulkhead should be
constructed on plaintiff's land.   Therefore it seems but just
that defendants should be required to maintain the same so
long as they continue to receive water from this source.

As successors to the Goodyear interests, the defendants
were only chargeable with such notice of the plaintiff's
rights as the actual situation presented.   So far as we can
discover, there is no evidence that defendants had actual
knowledge of the terms of the contract between the Good-
years and plaintiff.   Finding plaintiff in the actual enjoy-
ment of certain rights and privileges in the canal which
were open, visible, and notorious, the defendants, in equity,
were bound to respect those rights as they appeared, and to
make due inquiry as to their duration and extent.   There
is nothing in the Goodyears' contract with him that com-
pelled them to a perpetual maintenance of this canal.   Nor,
as we understand it, does the proof show that defendants
are the owners of all the land through which the canal flows
before it reaches the plaintiff's land.   The Goodyear fran-
chise (ch. 271, Laws of 1883), by its terms, gave them the
power to handle, own, and control the canal for the term
of ten years from the passage of that act.   At the expira-
tion of that time the right to collect tolls for floating tim-
bers thereon ceased.   There was no implied obligation to
keep up and maintain the ditch on their part after the ex-
piration of this period.   *Hoffman* succeeded to the rights
of the Goodyears in October, 1889.   By the instrument of
assignment, *Hoffman* took the " rights, franchises, privileges,
obligations, and duties conferred, granted, and imposed " on
them by virtue of the act of 1883; and he also agreed with

them "to keep and maintain in proper repair, and keep re-
paired, said ditch or canal," to save the Goodyears harmless
from all liability, and to furnish them with water to irrigate
their cranberry lands contiguous to said canal. This cove-
nant to repair the ditch was personal to the Goodyears, and
cannot be invoked to sustain the judgment. The plaintiff
might profit incidentally by its enforcement, but he can
compel its enforcement only so far as it affected his rights
of which the grantees of the Goodyears were bound to take
notice. The plaintiff's right to perpetually take water from
the canal being based upon the theory that it has become a
natural watercourse to his land, such right cannot be ampli-
fied to the extent of casting the burden of its perpetual
maintenance upon those who desire to make use of such
water as flows past him to the south. Undoubtedly the en-
joyment of the water flowing past plaintiff's land will ne-
cessitate the maintenance of the canal above, and to that
extent plaintiff will receive incidental benefits; but there is
nothing in the situation that we can discover that will pre-
vent defendants from abandoning their privileges. They
ought not to be permitted in any way to divert the water
or lessen its flow from Big Lake. So long as they seek to
continue the use and enjoyment of the water in the canal
below plaintiff's lands, they should be compelled to main-
tain the dam or bulkhead as adjudged by the court; but,
should they desire to abandon such use, then they should be
freed from any obligation to maintain the canal at any point.
In so far as the judgment imposes the burden on defendants
to perpetually maintain the bulkhead on plaintiff's land, and
the canal above the same, it cannot be sustained. The judg-
ment should require defendants to restore the water to the
channel as it flowed before their unlawful interference, and
they should be restrained from in any way interfering with
or diverting the flow of water from Big Lake. They should

also be required to build the bulkhead on plaintiff's land as adjudged by the court, and to maintain the same so long as they continue to use the water flowing past said land. No obligation in favor of plaintiff should be imposed on them to maintain the canal above his land.

*By the Court.*— That part of the judgment which is contrary to this opinion is reversed, and the judgment in all other respects is affirmed, and the cause is remanded for further proceedings in accordance with this opinion. No costs are allowed to either party, except that the respondent shall pay the fees of the clerk of this court.

·Winslow, J.   I do not intend to add materially to the literature of this unfortunate case, but simply wish to record my dissent from the principal conclusions which have now been reached by the majority of the court.   In my opinion, there is no satisfactory evidence in the case which sustains the findings of the trial court upon the main question of an ancient watercourse.   Granting, as I cheerfully do, that the decision upon the demurrer to the complaint is the law of this case, I still do not think that a watercourse was shown within that decision.   The evidence shows, to my mind, simply a vast marsh, miles in extent, into which waters from Big Lake oozed, and surface waters collected, permeating the soil, and became practically stagnant and lifeless, forming a vast expanse of bog, moss, and slime.   Out of this swamp, also, waters oozed at other places towards the east; but to say that it was a watercourse is, to my mind, simply a contradiction of terms.   By the same reasoning there is scarcely a marsh in the state which could not be converted into a watercourse, and the owners subjected to all the duties and limitations which devolve upon the owners of the banks of a watercourse.   Nor can I subscribe to the idea that the oral contract with Goodyear fastened a perpetual servitude

Case vs. Hoffman and others.

for all time upon the lands which Goodyear owned, in whose-soever hands they might come, to furnish water to the plaint-iff through the artificial canal.    Hence I think this judgment should be reversed *in toto*.

I am authorized to state that Mr. Justice PINNEY concurs in these views.

A motion for a rehearing was dismissed September 20, 1898.